No. 98-688

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 16

STATE OF MONTANA,

Plaintiff and Respondent,

v.

JAY BURKE WHIPPLE,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Margaret L. Borg, Chief Public Defender; Leslie Ocks,

Assistant Public Defender, Missoula, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Jim Wheelis,

Assistant Attorney General, Helena, Montana

Fred R. Van Valkenburg, Missoula County Attorney, Missoula, Montana

Submitted on Briefs: September 7, 2000
Decided: February 15, 2001

Filed:

_____

Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 Jay Burke Whipple appeals from the Judgment entered by the Fourth Judicial District Court, Missoula County, sentencing him to twenty years imprisonment on each of four counts of felony sexual assault with five years of each sentence suspended, sentences to run concurrently. We affirm.

¶2 Whipple raises the following issues on appeal:

¶3 1. Whether the District Court erred when it allowed a physician to testify as to what the two complaining witnesses told him during his examination of them?

¶4 2. Whether the admission of testimony that allegedly bolstered the credibility of the complaining witnesses should be reviewed for plain error?

BACKGROUND

¶5 On January 8, 1998, the State charged Whipple by Information with four counts of felony sexual assault in violation of § 45-5-502, MCA. The Information alleged three instances of sexual contact with A.N.P., who was nine years old at the time of contact, and one instance of sexual contact with A.B.P., who was eight years old at the time. Whipple entered a plea of "Not Guilty" to all charges on January 9, 1998.

¶6 A jury trial was held on July 13 and 14, 1998. The State's first witness was Timothy W. Carte, M.D., a pediatrician. Dr. Carte testified that he examined A.N.P. and A.B.P. in May 1997 after their mother brought them to him to be examined for possible sexual abuse. Dr. Carte took a health history of each child and, on the basis of what they told him, decided that a further physical examination was unnecessary. During the State's examination of Dr. Carte, the court allowed Dr. Carte to testify, over a hearsay objection, as to what the children told him had occurred between themselves and Whipple. Dr. Carte also testified,

without objection, as to the credibility of the children's stories.

¶7 The State then called Kirsten, the girls' mother. Kirsten testified that Whipple was her uncle, her mother's youngest brother, and that she had not had much to do with him until he moved from California to Montana in January 1996. Whipple worked the graveyard shift at a ranch near Potomac, Montana. Kirsten testified that Whipple invited the girls out to the ranch during calving to watch the calves being born. Kirsten allowed the girls to go to the ranch sometime between February and April 1996. A.N.P. went unaccompanied one night. A.B.P. went unaccompanied the following night. In early May 1996, Kirsten and her children visited Whipple at his trailerhome near Potomac. They had dinner, used the hot tub, and stayed the night. A.N.P. subsequently spent a night at Whipple's trailer after Whipple's wife and daughter moved from California. Kirsten testified that at the time, she had no reason to suspect that anything unusual occurred between Whipple and her daughters. The first time Kirsten became aware that something had happened was on Mother's Day of 1997. A.N.P. gave Kirsten a card which stated that Whipple had touched her on three separate occasions. A.B.P. also informed Kirsten that Whipple had inappropriately touched her on one occasion. Kirsten went to the police, who told her to have her daughters examined by a doctor. Lastly, Kirsten testified, without objection, that she did not believe the girls had lied about these incidents.

¶8 The State's next witness was Ramona, Kirsten's mother and Whipple's half-sister. Ramona testified that she accompanied the girls to their appointment with Dr. Carte and was present during Dr. Carte's examination of each girl. Ramona testified, without objection, that she had no reason to believe that what the girls told their mother or Dr. Carte was untrue.

¶9 The State then called A.N.P. to the stand. A.N.P., who was eleven years old at the time of trial, testified that the first incident of inappropriate touching occurred in the spring of 1996. Whipple invited her to the ranch where he worked. They checked on the cows and then watched some movies together in the basement of the ranch house. A.N.P. testified that while they were watching movies, Whipple told her to go to the couch and then he started massaging her legs. He then unbuttoned her pants, took them off, and got on top of her. A.N.P. stated that Whipple touched her vagina with his penis and his hands for about two minutes. Whipple drove A.N.P. back to Missoula, Montana, the next day. A.N.P. testified that she did not tell her mother because she did not think her mother would believe her, but she did tell her sister about the incident.

¶10 A.N.P. testified that the next incident occurred a couple of weeks later when her family was visiting Whipple at his trailerhome. A.N.P. stated that they used Whipple's hot tub, watched a T.V. show, and then went to bed in Whipple's living room. A.N.P. testified that while everyone else was sleeping, Whipple laid down next to her, took off her pajama pants, and started touching her with his penis and hands for about two minutes. A.N.P. testified that the last incident occurred about a month later at Whipple's trailer. She was staying with Whipple, Whipple's wife Sue, and Whipple's daughter Emily. A woman who was lost stopped by the trailer and asked for a ride. Sue Whipple gave the woman a ride home. While Sue was gone, Whipple took A.N.P. to his bedroom where he repeated what he had done before. A.N.P. testified that no other incidents of sexual contact occurred, and she subsequently avoided Whipple.

¶11 A.B.P., who was nine and a half years old at the time of trial, testified next. A.B.P. testified that she spent a night alone with Whipple during the spring of 1996. She and Whipple watched a movie in the basement of the ranch house. A.B.P. testified that Whipple unbuttoned her clothes and put his fingers in her vagina. A.B.P. said that Whipple told her that if she told her mother, he would slap her. On cross-examination, A.B.P. admitted that she did not tell Dr. Carte that Whipple put his fingers "inside her body." A.B.P. stated that she "didn't really want to tell anybody about it" and was scared.

¶12 The State then called Myra Ducharme, a clinical social worker. Ducharme testified that she had been working with A.N.P. and A.B.P. since shortly after they reported sexual abuse to their mother. Ducharme testified, without objection, that in her experience younger children like A.N.P. and A.B.P. do not lie about sexual abuse. She also testified, again without objection, that she had no reason to believe that the girls had been untruthful.

¶13 The State's final witness was Thomas Gregory Hintz, a deputy sheriff of Missoula County. Hintz was the primary investigator on the charges against Whipple. Hintz interviewed Kirsten and each of the girls separately. Hintz testified, without objection, that the testimony of A.N.P. and A.B.P. did not differ in any significant way from what they told him during his interviews of them.

¶14 The State rested its case. Whipple then testified on his own behalf. Whipple testified that both girls had spent the night at the ranch house during calving season but denied having any inappropriate contact with them. Whipple also denied having any inappropriate contact with A.N.P. on any other occasion.

¶15 Whipple's counsel then called James Meyers, a licensed clinical professional counselor. Meyers testified that he conducted a sexual offender evaluation of Whipple to determine if he fit the profile of known sexual offenders. Meyers stated that he did not see anything that would make him believe that Whipple was a sexual offender. At the conclusion of Meyers' testimony, the defense rested its case.

¶16 On July 14, 1998, the jury returned verdicts of guilty on all four counts. On September 4, 1998, the District Court sentenced Whipple to twenty years in the Montana State Prison on each of the four counts, the sentences to run concurrently. The court suspended five years of each sentence on certain terms and conditions. The court entered Judgment on September 16, 1998. From this judgment, Whipple appeals.

## STANDARD OF REVIEW

¶17 Whether evidence is relevant and admissible is left to the sound discretion of the district court and will not be overturned on appeal absent an abuse of that discretion. *State v. Sweeney*, 2000 MT 74, ¶ 13, 299 Mont. 111, ¶ 13, 999 P.2d 296, ¶ 13.

## ISSUE ONE

¶18 Whether the District Court erred when it allowed a physician to testify as to what the two complaining witnesses told him during his examination of them?

¶19 Kirsten testified that after her children told her that they had been sexually abused by Whipple, she talked to a member of the Missoula Police Department who told her to have her daughters examined by a doctor before coming into the station to file a report. Kirsten brought her children to Dr. Carte to be examined for possible sexual abuse. Dr. Carte examined each child separately, and on the basis of what each child told him, determined that further physical examination was unnecessary. During the State's examination of Dr. Carte, the State asked Dr. Carte to "tell us essentially what [A.N.P.] told you had happened." Whipple's counsel objected on the grounds that the testimony was hearsay. The State argued that Dr. Carte's testimony was admissible because "this was done for the purposes of a medical diagnosis and, secondly, that the witness will be called and will be subject to cross-examination herself." The District Court overruled the objection and allowed Dr. Carte to testify regarding what both A.N.P. and A.B.P. had told him had occurred. The court did not state on what basis it was allowing the testimony.

¶20 Whipple contends that the District Court erred in allowing Dr. Carte to testify as to what the girls told him during his examination. Whipple argues that Dr. Carte's testimony was not admissible under the "medical treatment exception" to the hearsay rule because the girls' statements to Dr. Carte were not motivated by a desire to obtain medical treatment and the trustworthiness of their statements were not assured where they had no medical conditions which required diagnosis or treatment.

¶21 The State agrees that Dr. Carte's testimony about what the girls told him was hearsay but contends that it was admissible under the "medical treatment exception." The State argues that Kirsten was seeking treatment for her daughters when she took them to Dr. Carte and that there was no indication that the girls were not aware that they should tell Dr. Carte the truth. The State admits, however, that A.B.P.'s testimony differs from what Dr. Carte testified she told him. A.B.P. testified that Whipple had penetrated her but she denied penetration when asked by Dr. Carte.

¶22 Rule 803(4), M.R.Evid., provides that "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are admissible even though the declarant is available as a witness. To be admissible under this exception to the hearsay rule, the statements must be made with an intention that is consistent with seeking medical treatment and must be statements that would be relied upon by a doctor when making decisions regarding diagnosis or treatment. *State v. Huerta* (1997), 285 Mont. 245, 258, 947 P.2d 483, 491. The rationale behind the medical treatment exception to the hearsay rule is that the reliability of the out of court statements are assured by the first prong of the test. The declarant who seeks medical treatment possesses a selfish motive in telling the truth because the declarant knows that "the effectiveness of the treatment [the declarant] receives may depend largely upon the accuracy of the information [the declarant] provides." *State v. Harris* (1991), 247 Mont. 405, 412-13, 808 P.2d 453, 457.

¶23 We have previously voiced concerns about the admission of hearsay statements of young children under this exception. In *State v. J.C.E.* (1988), 235 Mont. 264, 271, 767 P.2d 309, 314, we noted that "the rationale behind the medical treatment exception is less forceful where a very young child is concerned. The child might not comprehend the necessity of telling a doctor the truth in order to aid diagnosis and treatment." *Accord State v. Henderson* (1994), 265 Mont. 454, 462, 877 P.2d 1013, 1018. In *J.C.E.*, we refused to allow the admission of a child's hearsay statements regarding alleged incidents of sexual

abuse through the testimony of a family counselor. *J.C.E.,* 235 Mont. at 270-71, 767 P.2d at 313-14.

¶24 There are instances in which we have allowed physicians to testify as to statements made to them by youthful patients. In *State v. Thompson* (1993), 263 Mont. 17, 865 P.2d 1125, we upheld the admission of the testimony of an emergency room physician as to statements made by a ten-year old patient. The child had informed a teacher at her school that her stepfather had repeatedly kicked her. The teacher contacted social services and the police, who interviewed the child. The child was then taken to the emergency room because she complained of pain when she coughed and when she breathed. The emergency room physician examined the child and observed numerous bruises over her chest, back, right leg and left arm. When the physician asked the child why she was there to see him, she told him that her stepfather had kicked her numerous times. The physician noted that the bruises were 20-30 hours old and were consistent with injuries sustained from kicking. *Thompson*, 263 Mont. at 22, 865 P.2d at 1128.

¶25 We do not believe that the facts of the instant case contain sufficient indicia of reliability such as those present in *Thompson.* To be admissible under the medical treatment exception, the statements must be made with an intention that is consistent with seeking medical treatment. *Huerta*, 285 Mont. at 258, 947 P.2d at 491. In *Thompson*, the circumstances indicate that the child victim's statements were made with the intention of seeking effective treatment. The child had been taken to the hospital because she was suffering from pain when she coughed and breathed and she made the statements to her doctor in response to a question as to how she received her injuries. *Thompson*, 263 Mont. at 30, 865 P.2d at 1133-34. However, under the present circumstances, it does not appear A.N.P. and A.B.P.'s statements to Dr. Carte were made with an intention of seeking effective medical treatment. The children were not suffering from any physical trauma or condition which required treatment or diagnosis at the time Dr. Carte interviewed them. Instead, they were examined by Dr. Carte at the suggestion of a member of the Missoula Police Department almost a year after the incidences of sexual assault had occurred.[(1)] The State did not provide the District Court nor has it provided us with any evidence which would indicate that under these circumstances the children believed they needed to tell Dr. Carte the truth in order to receive effective treatment or diagnosis.

¶26 We hold that the District Court abused its discretion in admitting Dr. Carte's testimony as to what A.N.P. and A.B.P. told him. However, "a judgment of conviction will not be reversed unless the error prejudiced or tended to prejudice the substantive rights of the

defendant." *State v. Berosik*, 1999 MT 238, ¶ 20, 296 Mont. 165, ¶ 20, 988 P.2d 775, ¶ 20. We find reversible error based on prejudice to the defendant only where there is a reasonable possibility that the inadmissible evidence might have contributed to the conviction. *State v. Benson*, 1999 MT 324, ¶ 22, 297 Mont. 321, ¶ 22, 992 P.2d 831, ¶ 22.

¶27 Whipple has not established that he was prejudiced by Dr. Carte's testimony. The State claims that the 2admission of the testimony was harmless because "[w]hat the girls said to Dr. Carte was, with one exception, what they said at trial." We agree. Dr. Carte's testimony was largely repetitive of the testimony of A.N.P., A.B.P., and their mother, all of which was properly admitted. *See State v. Alexander* (1994), 265 Mont. 192, 198, 875 P.2d 345, 349 (holding that erroneously admitted evidence was harmless because "it did not include any information that was not verified by the victim later during the course of the trial"); *see also State v. Washington* (N.C. Ct. App. 1998), 506 S.E.2d 283, 288 (holding that erroneously admitted statements by non-testifying rape victim to police officers did not prejudice defendant because they were repetitive of admissible statements made by victim to other witnesses).

¶28 We conclude that although the District Court abused its discretion when admitting the statements made by A.N.P. and A.B.P. to Dr. Carte, Whipple was not harmed by that error.

## ISSUE TWO

¶29 Whether the admission of testimony that allegedly bolstered the credibility of the complaining witnesses should be reviewed for plain error?

¶30 Whipple contends for the first time on appeal that the admission of the following testimony was erroneous: Dr. Carte testified that he did not have any reason to believe that either child fabricated their allegations. Kirsten, the girls' mother, testified that "[t]heir stories have never changed" and had no reason to believe that the girls made up their allegations. Ramona, the girls' grandmother, testified that she had no reason to believe that the girls' allegations were untrue. Ducharme, the girls' counselor, testified that in her experience, "younger children don't lie about child sexual abuse, because they don't know how to." She also testified that she had no indication that the girls were being untruthful. Lastly, Hintz, the primary investigating officer, testified that he was present during the girls' testimony and that their testimony did not differ in any significant way from what they told him when he first interviewed them. Whipple failed to make a contemporaneous

objection to any of this testimony.

¶31 Whipple now contends that the admission of this testimony bolstered the girls' credibility and was therefore erroneous pursuant to our decision in *State v. Hensley* (1991), 250 Mont. 478, 821 P.2d 1029. Whipple observes that in *Hensley* we held that expert testimony regarding credibility was admissible in a sexual abuse case involving a young child only if the child testifies at trial, the child's credibility is brought into question, and the expert witness is properly qualified. *See Hensley*, 250 Mont. at 481, 821 P.2d at 1031. Whipple acknowledges that he did not make a contemporaneous objection to this testimony and does not contend that his claim of error is reviewable pursuant to § 46-20-701(2), MCA. Instead, Whipple argues that we should review his claim pursuant to *State v. Finley* (1996), 276 Mont. 126, 915 P.2d 208. In this regard, Whipple contends that his "right to a fair trial was compromised by the cumulative effect of five witnesses' testimony that the complaining witnesses were credible." Whipple insists that the jury cannot be said to have exercised its function of determining the credibility of the complaining witnesses.

¶32 We have held that, notwithstanding the failure to object to an alleged error and the inapplicability of § 46-20-701(2), MCA, we may review a claimed error which affects fundamental constitutional rights where failing to review it may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process. *Finley*, 276 Mont. at 137, 915 P.2d at 215. In adopting this rule we also stated that we would "henceforth use our inherent power of common law plain error review sparingly, on a case-by-case basis, and [that we would] invoke that doctrine only in the class of cases aforementioned." *Finley*, 276 Mont. at 138, 915 P.2d at 215. In order to invoke our power of review under *Finley*, the defendant must "demonstrate that a fundamental right constitutionally guaranteed to [the defendant] was implicated by the plain error which [the defendant] claims," *State v. Pizzichiello*, 1999 MT 123, ¶ 11, 294 Mont. 436, ¶ 11, 983 P.2d 888, ¶ 11; and the defendant must "show that our failing to review the claimed error at issue would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial proceedings or compromise the integrity of the judicial process," *Pizzichiello*, ¶15.

¶33 Whipple has not carried his initial burden of demonstrating that a fundamental right constitutionally guaranteed to him was implicated by the error which he claims. Whipple contends that his right to a fair trial as guaranteed by Article II, Section 24 of the Montana Constitution was "compromised." However, an appellant who claims plain error must do

more than simply point to the Constitution and insist that his or her rights were violated. Rather, the appellant's claim must be based on a specific provision. It is not obvious to us, nor was it likely obvious to the State when briefing this issue, exactly which right of Whipple's contained in Article II, Section 24 was "compromised" by the alleged error. Article II, Section 24 contains a "laundry list" of rights:

> **Rights of the accused. In all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel; to demand the nature and cause of the accusation; to meet the witnesses against him face to face; to have process to compel the attendance of witnesses in his behalf, and a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed, subject to the right of the state to have a change of venue for any of the causes for which the defendant may obtain the same.**

¶34 Because claims of plain error are almost invariably claims raised for the first time in a defendant's brief on appeal, a defendant must do more than simply make a generalized claim that his or her constitutional rights were violated by the alleged error. *See Pizzichiello*, ¶12 (observing that defendant had carried his initial burden by citing relevant federal and state authority). Otherwise, the defendant's claim is inadequately argued or not argued at all; the State is unable to respond to the defendant's arguments; and we are left completely without guidance.

¶35 Accordingly, we will continue to require that a defendant "*demonstrate* that a fundamental right constitutionally guaranteed to [the defendant] was implicated by the plain error which [the defendant] claims." *Pizzichiello*, ¶ 11 (emphasis added). Because Whipple has not met his burden of demonstrating that a fundamental right constitutionally guaranteed to him was implicated by the allegedly erroneous admission of credibility testimony, we cannot review his claim.

¶36 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

## /S/ W. WILLIAM LEAPHART

## /S/ TERRY N. TRIEWEILER

1. Some commentators have been highly critical of the admission of statements by children describing abuse, contending that "doctors and social workers who interview children shortly after abuse occurs often act almost as extensions of the offices of prosecutors and police, and in some urban hospitals special areas are set aside to collect statements by abuse victims in order to qualify them under the [medical treatment] exception." 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 442, at 464-65 (2d ed. 1994). Mueller and Kirkpatrick observe that "the criteria underlying the exception are not well-suited to appraising such statements." Mueller & Kirkpatrick § 442, at 465.