FILED

02/06/2018

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0744

DA 15-0744

IN THE SUPREME COURT OF THE STATE OF MONTANA

2018 MT 16

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

AARON ANTONIO PORTER,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC-14-243C
Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Moses Okeyo, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Jonathan M. Krauss, Assistant
Attorney General, Helena, Montana

          Marty Lambert, Gallatin County Attorney, Bozeman, Montana

Submitted on Briefs:  November 8, 2017

Decided:  February 6, 2018

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 A Gallatin County jury convicted Aaron Antonio Porter of felony aggravated assault under § 45-5-202, MCA, for strangling his domestic partner, Michelle Allen, during a domestic dispute. Allen did not appear or testify at trial. Over Porter's objection, the District Court admitted testimony from an emergency room physician about Allen's statements during her examination. Porter argues on appeal that the doctor's testimony violated his Confrontation Clause rights and was not admissible under the hearsay exception for statements made for medical diagnosis or treatment. We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 One morning in August 2014, Michelle Allen arrived at work with a black eye and bruises on her neck, face, and arms. Her supervisor, Michael Bonander, called the police to report that Allen had been assaulted. Belgrade Police Officer Jesse Stovall responded and spoke to Allen. She identified Porter as her attacker. After the interview, Officer Stovall brought Allen to the emergency room. Allen signed a medical release form authorizing the hospital to release patient health information to the police. Dr. Tiffany Kuehl, an emergency room physician and the medical director of the Sexual Assault Nurse Examiner (SANE) team at the hospital, examined Allen. The exam revealed tenderness, bruises, and other markings on Allen's back, shoulders, neck, face, arms, and legs. Dr. Kuehl noted that Allen's injuries were consistent with strangulation. Following the medical examination, the police arrested Porter for assault. After his arrest, Porter waived his *Miranda* rights and gave an interview to the police. The State charged Porter with felony aggravated assault under § 45-2-202, MCA.

¶3     The case went to trial in September 2015.  Allen did not testify, despite the District Court's issuance of a material witness arrest warrant compelling her to appear.  Along with photographs of Allen's injuries and portions of Allen's medical records, the State called four other witnesses:

¶4     Sharina Johnson, Allen's upstairs neighbor, testified that she heard "thuds" coming from the apartment the afternoon of the assault.  She heard Allen tell Porter to stop hitting her and Porter reply, "No."  Johnson also stated that she heard Allen "crying hysterically" and "gasping for air."

¶5     Bonander testified that Allen was "really upset" when she came to work the next morning.  He testified that she was covered in bruises on her face, neck, and arms, and that he called the police.

¶6     Officer Stovall testified that when he first responded to the incident, he noticed that Allen had a black eye, a swollen cheek, and abrasions and bruises all over her body.  He testified that he transported her to the hospital for examination.  He stated that he was not present during the medical examination, but did talk to Dr. Kuehl afterwards pursuant to the release signed by Allen.  Officer Stovall also testified to Porter's responses from his police interview.  Porter told Office Stovall that he and Allen had gotten into a fight over the cable bill and began pushing and shoving each other.  Porter stated that while pushing and shoving each other in the doorway of the bedroom they tripped and fell into the bedroom wall, cracking it.  They then ended up struggling on the bed.  Porter told the officers that he grabbed Allen's throat after she grabbed his.  He reported that he held her throat for a period of "maybe" twenty to twenty-five seconds, "enough just to get her off

3

of [him]." When the officers asked whether he squeezed Allen's neck hard enough for her to lose oxygen, Porter responded, "I probably did—I don't know like I said we were both heated and both arguing."

¶7 Dr. Kuehl testified to her examination of Allen. She testified that Allen had bruises and abrasions all over her body, including on her shoulder, back, neck, face, arm, hand, knee, and hip. She stated that Allen "had a tender area across the entire anterior or front of her neck, and above the tender area and bruise there were petechia," which she described as "tiny purplish red spots that appear on the skin when very small capillary blood vessels are ruptured." Dr. Kuehl observed that the injuries on Allen's neck and face were indicative of strangulation.

¶8 Over Porter's objection, Dr. Kuehl also testified about the "verbal history" of the incident she elicited from Allen. Dr. Kuehl testified that she takes verbal histories from patients because "[i]t is very important to understand what the injuries might be, and also to assess their safety and need for further treatment." She stated that she relies on what patients tell her to diagnose and render treatment.

¶9 Dr. Kuehl asked Allen about the identity of her attacker. Dr. Kuehl explained the importance of this question, stating,

> I attempt to obtain an identity, aiming at guaranteeing the safety of the patient, and where they will go home, so if they were attacked by someone in their apartment, I make sure that I have alternative arrangements for them to stay when I discharge them from the emergency department.

Dr. Kuehl explained further that, in apparent domestic violence cases, "It is my job to ensure the safety of all my patients, so it is my habit to ensure that they are living in safe

4

circumstances." She acknowledged that her role was to "investigate" a victim's injuries related to what they report happened and to "make sure that there is an accurate representation of the injuries, their measurements and their level of seriousness so that the patient may be able to pursue a case in court and have appropriate justice." Dr. Kuehl reported that Allen told her she was thrown against the wall to the point of feeling dazed and strangled twice by her domestic partner, but that Allen did not identify him by name.

¶10 Allen reported to Dr. Kuehl that during the first strangulation she was lifted off the ground by the throat. Allen told Dr. Kuehl that during the second strangulation she was strangled to the point of unconsciousness. Dr. Kuehl testified that it is also her "custom and habit" to ask patients involved in domestic assaults "what's going through their mind during the assault." She stated that Allen told her that, "at the moment that she lost consciousness, during the second strangulation, she felt that she was going to die." Dr. Kuehl testified that, in her many years of experience working with victims of strangulation, such feelings of impending death were commonly reported.

¶11 Allen's verbal history gave Dr. Kuehl concern that Allen's carotid arteries may have been injured by excessive pressure, which could cause acute stroke or death in the days or weeks subsequent to an episode of strangulation. She ordered a CT scan of Allen's neck to evaluate this risk. The scans came back normal. Dr. Kuehl ultimately diagnosed Allen with strangulation and asphyxia, suspected posterior rib fracture, a concussion, and bruising. She said that the cause of Allen's injuries was "assault by her domestic partner with strangulation." Dr. Kuehl testified that in her opinion it was a near fatal strangulation.

5

¶12 Porter had sought to exclude Dr. Kuehl's testimony, in part because Allen's statements during her exam constituted testimonial hearsay and were inadmissible. The District Court denied Porter's motion, reasoning that the statements were not testimonial in nature and therefore did not trigger the constitutional protections of the Confrontation Clause. The court held that the statements were admissible under the hearsay exception for information related to medical examinations under M. R. Evid. 803(4).

¶13 A Gallatin County jury found Porter guilty of felony aggravated assault. The District Court sentenced Porter to fifteen years in prison. Porter appeals.

## STANDARDS OF REVIEW

¶14 We review a district court's conclusions of law and interpretations of the constitution de novo. *State v. Mizenko*, 2006 MT 11, ¶ 8, 330 Mont. 299, 127 P.3d 458. "Whether evidence is relevant and admissible is left to the sound discretion of the district court and will not be overturned on appeal absent an abuse of discretion." *State v. Whipple*, 2001 MT 16, ¶ 17, 304 Mont. 118, 19 P.3d 228. A determination that M. R. Evid. 803(4) allows certain hearsay testimony to be admitted is an evidentiary issue reviewed for abuse of discretion. *State v. Huerta*, 285 Mont. 245, 258, 947 P.2d 483, 491 (1997).

## DISCUSSION

¶15 *1. Did Dr. Kuehl's testimony concerning the victim's out-of-court statements violate Porter's Confrontation Clause rights?*

¶16 Porter argues that Allen's statements to Dr. Kuehl were testimonial in nature. For that reason, he contends that the District Court violated his rights under both the federal

and Montana constitutions when it admitted those statements because Porter did not have a prior opportunity to cross-examine Allen.[1]

¶17    The Sixth Amendment to the United States Constitution guarantees that "the accused shall enjoy the right . . . to be confronted with the witnesses against him." Article II, Section 24 of the Montana Constitution guarantees that "the accused shall have the right . . . to meet the witnesses against him face to face." These rights are similar, but we have acknowledged that Montana's Confrontation Clause may provide greater protection than the Sixth Amendment to the United States Constitution in certain circumstances. *State v. Clark*, 1998 MT 221, ¶¶ 20-25, 290 Mont. 479, 964 P.2d 766 (holding that a written state crime lab report entered into evidence without requiring testimony from and cross-examination of the technician who wrote the report violated Article II, Section 24). Although Porter argues that Article II, Section 24 provides greater protection of his right to face witnesses against him than the federal constitution provides, he fails to articulate how his claim implicates any enhanced right afforded under the Montana Constitution. Because Porter does not explain what additional protection the state constitution affords him for this particular claim, we analyze the state and federal constitutional claims together. *State v. Covington*, 2012 MT 31, ¶¶ 20-21, 364 Mont. 118, 272 P.3d 43 (holding that we will not undertake a unique state constitutional analysis unless

---

[1]  Porter argues in his reply brief that the State did not demonstrate that Allen was unavailable to testify. The State moved to strike, arguing that Porter violated M. R. App. P. 12(3). We denied the motion pending our decision in the case. This Court will not entertain an argument first raised in a reply brief. *State v. Sebastian*, 2013 MT 347, ¶ 26, 372 Mont. 522, 313 P.3d 198. But because we decide that Allen's statements were not testimonial, we need not consider the question.

the defendant establishes sound and articulable reasons for the greater protection he seeks to invoke).

¶18 Under the Sixth Amendment Confrontation Clause, testimonial statements made out of court may not be admitted as evidence in a criminal trial against a defendant unless the declarant is unavailable to testify and the defendant had a previous opportunity to cross-examine the declarant. *See Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1396 (2004). Since *Crawford*, the United States Supreme Court has further defined what constitutes a testimonial statement. *See, e.g., Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2274-75 (2006) ("Without attempting to produce an exhaustive classification . . ., it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."); *Michigan v. Bryant*, 562 U.S 344, 366, 131 S. Ct. 1143, 1160 (2011) ("[W]hether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation.").

¶19 Most recently, the Supreme Court explained that "the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, ___ U.S. ___,

8

135 S. Ct. 2173, 2180 (2015) (quoting *Bryant*, 562 U.S. at 358, 131 S. Ct. at 1155). The Supreme Court declined to adopt a categorical rule that statements to non-law-enforcement individuals fall outside Sixth Amendment protection. *Clark*, 135 S. Ct. at 2181. It clarified that "statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Clark*, 135 S. Ct. at 2182.

¶20 *Clark* concerned the testimony of two preschool teachers who questioned a three-year-old boy about who had hurt him when he came to school with bruises on his face and body. *Clark*, 135 S. Ct. at 2178. The boy told them his mother's boyfriend had caused the injuries. *Clark*, 135 S. Ct. at 2178. The trial court determined that the boy was incompetent to testify under Ohio law, but admitted the teachers' testimony about the boy's out-of-court statements. *Clark*, 135 S. Ct. at 2178. The Supreme Court held that the boy's statements were nontestimonial. The Court explained that the teachers sought the identity of the abuser in order "to protect the victim from future attacks." *Clark*, 135 S. Ct. at 2181. The Court held that "whether the teachers thought that this would be done by apprehending the abuser or by some other means is irrelevant." *Clark*, 135 S. Ct. at 2181. The fact that the teachers' questions, along with their statutory duty to report suspected child abuse, "had the natural tendency to result in Clark's prosecution" was also irrelevant. *Clark*, 135 S. Ct. at 2183.

¶21 Relying on this Court's interpretation of *Crawford* in *Mizenko*, ¶ 23, Porter maintains that Allen's statements were testimonial because she had a "clear reason" to believe that her statements would be used in court as substantive evidence against Porter.

9

Porter highlights that Officer Stovall drove Allen to the hospital and that Allen signed a medical release so that the police could receive health information related to her medical examination from Dr. Kuehl. Additionally, Porter argues that Dr. Kuehl was not responding to an emergency or providing needed medical care because the attack had occurred the previous evening; rather, Porter contends, Dr. Kuehl's examination of Allen should be considered a forensic examination completed for the purpose of gathering evidence for the prosecution. Porter specifically challenges Dr. Kuehl's testimony that Allen identified her attacker as her domestic partner and that Allen stated she felt that she was going to die.

¶22 The State counters that the statements to Dr. Kuehl were not testimonial. The State argues that the proper inquiry is whether "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Clark*, 135 S. Ct. at 2180 (quoting *Bryant*, 562 U.S. at 358, 131 S. Ct. at 1155). The State argues the primary purpose of Allen's statements to Dr. Kuehl was to receive medical treatment for her injuries.

¶23 We decided *Mizenko* only two years after the Supreme Court's decision in *Crawford*. More recently, we applied the "primary purpose" test to hold that driver's license suspension letters issued by the State Motor Vehicle Division are not testimonial for Confrontation Clause purposes. *City of Kalispell v. Omyer*, 2016 MT 63, ¶¶ 23-24, 383 Mont. 19, 368 P.3d 1165 (citing *Davis*, 547 U.S. at 822, 126 S. Ct. at 2273). Given both this Court's and the Supreme Court's recent holdings articulating the primary purpose test

10

to determine whether a statement is testimonial, we agree with the State that *Clark*, 135 S. Ct. at 1280, provides the correct inquiry for our analysis in this case.

¶24    Dr. Kuehl testified that that she takes verbal histories from patients to assess both their safety and their need for further treatment.  Like the teachers in *Clark*, Dr. Kuehl testified that she asks about the attacker's identity to ensure the safety of her patients upon discharge from the emergency room, i.e., to prevent future harm.  Beyond ensuring future safety, the verbal history provided Dr. Kuehl with the information she needed to decide what treatment to order for Allen.  In fact, Dr. Kuehl ordered a CT scan to rule out injury to Allen's carotid arteries based on Allen's statements explaining the manner in which she was strangled—including being lifted off the ground, feeling like she was going to die, and losing consciousness.

¶25    Porter argues that Dr. Kuehl acted as a SANE during her examination.  Porter argues that SANEs can act essentially as government agents when they carry out their investigative duties as part of a formal law enforcement investigation.  The record does not support Porter's contentions.  Dr. Kuehl is a physician, not a nurse.  She did not gather evidence primarily for possible future criminal prosecution; she examined Allen's injuries, evaluated her condition, and provided her with medical care.  Although Dr. Kuehl stated that part of her role was to ensure that "there is an accurate representation of the injuries . . . so that the patient may be able to pursue a case in court," this does not automatically transform the examination's primary purpose into creating an out-of-court substitute for trial testimony.  Dr. Kuehl had an obligation, beyond any potential use in future prosecution, to document Allen's injuries accurately and to treat her condition

11

appropriately. Whether Dr. Kuehl's diagnosis of assault by domestic partner with strangulation "had a natural tendency to result in [Porter's] prosecution" is irrelevant. *See Clark*, 135 S. Ct. at 2183.

¶26 The circumstances surrounding Dr. Kuehl's conversation with Allen lead us to conclude that the primary purpose of the conversation was not to create an out-of-court substitute for trial testimony. Officer Stovall drove Allen to the emergency room, had her sign a release, and waited for her; he did not, however, participate in the actual medical exam. Before going to the hospital, Allen already had identified her attacker and described the attack to Office Stovall. Further, Dr. Kuehl is not a law enforcement officer. The exam took place in the emergency room, not at the police station. Dr. Kuehl conducted tests to rule out internal injuries and provided Allen with treatment, including intravenous fluids and pain medication. Based on these circumstances, Allen's primary purpose in speaking with Dr. Kuehl was to receive medical care for her injuries, not to create an out-of-court substitute for trial testimony. Allen's statements to Dr. Kuehl were therefore nontestimonial and their admission did not violate Porter's Confrontation Clause rights under the Sixth Amendment to the United States Constitution or Article II, Section 24 of the Montana Constitution.

¶27 *2. Did Dr. Kuehl's testimony meet the M. R. Evid. 803(4) hearsay exception as a statement made for purposes of medical diagnosis or treatment?*

¶28 Porter argues that the District Court erred in admitting testimony under M. R. Evid. 803(4) from Dr. Kuehl relating to (1) the attacker's identity, and (2) Allen's mental state

12

as she was strangled. Porter argues that the record does not demonstrate that these statements were reasonably pertinent to diagnose or treat Allen.

¶29 The State counters that Allen's statements concerned the very reason she sought care from Dr. Kuehl and that Dr. Kuehl indeed relied on those statements in deciding to order a CT scan and chest x-ray and to administer intravenous fluids and medications. Further, the State argues that the continuum of medical treatment logically extends beyond the initial hospital visit; in fact, Dr. Kuehl testified that asking about the identity of the attacker was important to assess Allen's safety and to make alternative arrangements upon discharge if needed.

¶30 Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. M. R. Evid. 801(c). Hearsay is not admissible as evidence in court unless it falls under an exception provided in statute or another rule. M. R. Evid. 802. Statements made "for purposes of medical diagnosis or treatment," including statements "describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof" are excepted from the general hearsay prohibition, "insofar as reasonably pertinent to diagnosis or treatment." M. R. Evid. 803(4).

¶31 Courts are guided by two factors in determining admissibility under M. R. Evid. 803(4): (1) "the statements must be made with an intention that is consistent with seeking medical treatment"; and (2) the statements "must be statements that would be relied upon by a doctor when making decisions regarding diagnosis or treatment." *Whipple*, ¶ 22. The first factor ensures the reliability of the out-of-court statements: "The declarant who seeks

medical treatment possesses a selfish motive in telling the truth because the declarant knows that 'the effectiveness of the treatment [the declarant] receives may depend largely upon the accuracy of the information [the declarant] provides.'" *Whipple*, ¶ 22 (quoting *State v. Harris*, 247 Mont. 405, 412-13, 808 P.2d 453, 457 (1991)). The trial court has discretion to determine whether testimony falls under the M. R. Evid. 803(4) exception. *Huerta*, 285 Mont. at 258, 947 P.2d at 491.

¶32 Porter challenges the second prong of the analysis, arguing that the statements were not "reasonably pertinent to diagnosis or treatment." *See* M. R. Evid. 803(4). But the record reflects, in accord with the District Court's ruling, that the identity of the perpetrator and circumstances surrounding Allen's injuries—including her state of mind—were statements related to the "inception or general character of the cause or external source" of Allen's injuries. M. R. Evid. 803(4). Dr. Kuehl sought specific information on how Allen was injured in part to assess the potential severity of any injuries that were not immediately apparent, such as damage to Allen's carotid arteries. Based on the verbal history from Allen, Dr. Kuehl "obtained a CT scan of the neck with angiography, which uses a type of highlighting intravenous dye to evaluate whether there was any injury to her carotid arteries, because [she] was so concerned that excessive pressure had been used in that area, especially with [Allen] reporting that she was held up by her neck." Thus, Dr. Kuehl used Allen's statements regarding the severity of the attack to make diagnosis and treatment decisions.

¶33 Further, we agree with the State that Dr. Kuehl's role as a medical provider logically extended beyond treating cuts and bruises. Dr. Kuehl testified that she sought information

14

about the identity and severity of the attack for discharge planning purposes. She explained that "It is my job to ensure the safety of all my patients, so it is my habit to ensure that they are living in safe circumstances."

¶34 The medical community recognizes Intimate Partner Violence (IPV) as a public health problem. *See, e.g.*, Connie Mitchell & Lisa James, *Evolving Health Policy on Intimate Partner Violence, in Intimate Partner Violence: A Health-Based Perspective*, 1, 1 (Connie Mitchell ed., 2009); Frederick P. Rivara et al., *Healthcare Utilization and Costs for Women with a History of Intimate Partner Violence*, 32 Am. J. Preventative Med. 89, 89 (2007). Medical studies have demonstrated the significant health consequences of IPV beyond the physical injuries immediately presenting to the medical provider. *See* Nancy Sugg, *Intimate Partner Violence: Prevalence, Health Consequences, and Intervention*, 99 Med. Clin. N. Am. 629, 633 (2015). Women who have experienced IPV have an increased risk of chronic pain, gastrointestinal disorders, and chronic disease, such as asthma, stroke, high blood pressure, high cholesterol, heart attack, heart disease, and cardiovascular disease. Sugg, *supra*, at 633-34. Nearly twenty percent of women who experienced IPV within the past year had a partner who prevented them from going to the doctor or interfered with their healthcare. Sugg, *supra*, at 634. Additionally, women who have experienced IPV are more likely to have mental health issues and are more likely to engage in other risky behaviors, such as smoking and substance abuse. Sugg, *supra*, at 635-36. Studies have shown increased healthcare utilization and medical care costs for individuals with a history of IPV, costing the healthcare system millions of dollars in additional healthcare costs each year. Rivara, *supra*, at 89, 94. One study showed that

15

sixty-four percent of female victims of IPV had received care in an emergency department in the year before the assault. Sugg, *supra*, at 638. For this group of women, the median number of emergency room visits was four over the course of three years. Sugg, *supra*, at 638. Studies also show that utilization of mental health, substance abuse, and emergency department services decreased with cessation of IPV, and further decreased over time after IPV ceased. Rivara, *supra*, at 93. And some studies have shown that intervention from a medical provider reduces the recurrence of IPV. Sugg, *supra*, at 641; Rivara, *supra*, at 94 ("Routine screening can lead to increased identification of IPV, and interventions such as protection orders can reduce the risk of recurrent IPV by 50%"). Thus, intervention by a medical provider can help reduce the risk of additional violent attacks, the need for future medical care, and healthcare costs.

¶35     Best practices for medical intervention "include acknowledging the problem, assessing safety, referring to appropriate resources, and documenting appropriately in the medical record." Sugg, *supra*, at 641. As part of the safety assessment, medical providers may ask questions to assess the future risk of severe injury or death their patient faces. Sugg, *supra*, at 642. One danger assessment tool that has been shown to be effective at predicting future risk of severe injury or death in clinical trials includes both objective questions ("Has he ever used a weapon or threatened you with a weapon?) and subjective questions ("Do you believe he is capable of killing you?"). Sugg, *supra*, at 642. Studies show that positive answers to such questions are predictive that the patient is at higher risk of severe injury or death. Sugg, *supra*, at 642. Such questions help medical providers determine the patient's health risks and potential next steps. *See* Sugg, *supra*, at 642.

16

Ultimately, in addressing IPV "it is the patient's decision regarding the next steps to take, but *as with any health risk*, patients need to be fully informed when making their decisions." Sugg, *supra*, at 642 (emphasis added). Inquiring into the identify of their attacker and the severity of any IPV allows medical providers to help their patients make fully informed decisions.

¶36    Dr. Kuehl testified that "it is very important to understand what the injuries might be, and also to assess [the patient's] safety and need for further treatment." Dr. Kuehl further testified that it was part of her "custom and habit" in making her assessment of patients to inquire into their state of mind during the assault. Answers to questions about the environmental factors of injury inform treatment decisions the medical provider makes. They also provide medical providers with a better understanding of the risk of future harm the patient faces. Health issues do not occur in a vacuum. Medical providers recognize the significance of IPV, its severity, and its impact on their patients' future health when gathering information from the patient to make medical decisions and to provide medical advice and treatment. The Rules of Evidence allow providers to offer testimony about what informs their diagnosis and treatment decisions. Subjective impressions, such as the patient's state of mind during the attack, can inform a doctor's assessment of the future health risks a patient faces. Therefore, statements identifying Allen's attacker and her state of mind were reasonably pertinent to diagnosis and treatment. The District Court did not abuse its discretion in admitting the testimony of Dr. Kuehl under M. R. Evid 803(4).

17

## CONCLUSION

¶37 The conviction is affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

Justice Dirk Sandefur, specially concurring.

¶38 I concur with the Court's ultimate holdings that Dr. Kuehl's disputed testimony was admissible under M. R. Evid. 803(4) and did not violate Porter's right to confront adverse witnesses under the Sixth and Fourteenth Amendments of the United States Constitution and Article II, Section 24 of the Montana Constitution. However, regardless of the medical community's purported recognition of "Intimate Partner Violence (IPV) as a public health problem," I cannot join the Court's express or implicit justification of these holdings on the ground that the scope of Dr. Kuehl's medical treatment included identifying an abuser to facilitate the post-release safety of the patient and gathering evidence "so that the patient may be able to pursue a case in court and have appropriate justice." I certainly agree that those purposes are manifestly compelling public safety and social justice purposes. However, protecting an abused patient from her abuser after she leaves the hospital and gathering evidence to facilitate his criminal prosecution by the State do not constitute "medical treatment" within the plain meaning, and underlying circumstantial indicia of trustworthiness, of M. R. Evid. 803(4). Admission of Dr. Kuehl's testimony was

independently correct without need for distortion of the plain meaning of "medical treatment."

¶39 Narrowly at issue is Dr. Kuehl's testimony that Allen told her that Allen's unnamed domestic partner assaulted her and that "she felt that she was going to die" when he was strangling her. The State does not dispute that Dr. Kuehl's testimony was inadmissible hearsay within the general rule of M. R. Evid. 801(c) and 802. Qualifying out-of-court statements made for purposes of medical diagnosis or treatment are admissible as a narrow exception to the hearsay rule. M. R. Evid. 803(4). The circumstantial indicium of trustworthiness underlying this exception is that a person will generally make truthful statements to an attending physician in furtherance of the person's self-interest in effective medical treatment. *State v. Whipple*, 2001 MT 16, ¶ 22, 304 Mont. 118, 19 P.3d 228. Over the years, the Court has over-simplistically reduced M. R. Evid. 803(4) to a two-part test that does not give effect to all of the language of the rule. *See Whipple*, ¶ 22 ("statements must be made with an intention that is consistent with seeking medical treatment and must be statements that would be relied upon by a doctor when making decisions regarding diagnosis or treatment").[1] Giving effect to all of the language of the rule, M. R. Evid. 803(4) permits admission of otherwise inadmissible hearsay statements only if:

---

[1] In pertinent part, the actual text of M. R. Evid. 803(4) reads:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . Statements made for purposes of medical diagnosis or treatment *and* describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof *insofar as* reasonably pertinent to diagnosis or treatment.

(Emphasis added.)

(1)     the declarant made the statement for the purpose of obtaining a "medical diagnosis or treatment;"

(2)     the statement "described:"

    (A)     the declarant's "medical history;"

    (B)     "past or present symptoms, pain, or sensations;" or

    (C)     the "inception or general character of the cause or external source" of those symptoms, pains, or sensations; and

(3)     the statement was "reasonably pertinent to diagnosis or treatment" of the declarant's symptoms, pains, or sensations.

¶40     Independent of M. R. Evid. 803(4), the Sixth Amendment prohibits admission of testimonial out-of-court statements unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004). Regardless of knowledge or intent that the statements will facilitate a criminal prosecution, statements made to a private party are generally not testimonial if the primary purpose of the statements, and the person who heard them, was a purpose other than to facilitate a criminal prosecution. *See Ohio v. Clark*, __ U.S.__, __, 135 S. Ct. 2173, 2181-83 (2015) (admission of out-of-court statements made by abused student to investigating teachers subject to mandatory reporting statute not testimonial where teachers were primarily acting in furtherance of child's welfare and child was unaware of potential prosecutorial use of the statements).

¶41     Here, Allen did not seek medical care after the assault and there is no evidence that she intended to do so until an investigating law enforcement officer contacted her at work the next day and obtained her consent to take her to the hospital for an emergency room

20

examination. At the hospital, Allen signed a release at the request of the law enforcement officer authorizing the attending physician to disclose her examination findings to the officer. However, regardless of the fact that it was not her idea to seek medical care and that she was well aware that her statements to Dr. Kuehl would likely facilitate a criminal prosecution, Allen had been violently beaten and strangled the night before. At the time she consented to the examination and spoke with Dr. Kuehl, Allen was suffering from a subsequently-diagnosed brain concussion and a possible rib fracture. The record clearly reflects that she made the statements at issue in the course of describing her condition at the time of examination and to what she attributed her injuries.

¶42    Under these circumstances it is unreasonable to conclude that Allen's motive for consenting to the medical examination did not include the desire to obtain any necessary medical care or that such motive was not the primary motivation for consenting to the examination. Likewise, regardless of Dr. Kuehl's unquestionable ulterior prosecutorial motive as the medical director of the SANE program, her first and foremost purpose was to provide medical diagnosis and care to Allen. Without further elaboration, I would hold that Dr. Kuehl's testimony was admissible pursuant to M. R. Evid. 803(4) and that the hearsay statements to which she referred were not testimonial statements barred from admission by the Sixth and Fourteenth Amendments of the United States Constitution and Article II, Section 24 of the Montana Constitution.[2]

---

[2] Porter has put forth no compelling analysis or showing that the Framers of Article II, Section 24 of the Montana Constitution contemplated that the Montana Constitution would afford a confrontation right greater than guaranteed by the federal constitution.

¶43    For the foregoing reasons, I specially concur with the result reached by the Court.


/S/ DIRK M. SANDEFUR


Justice Laurie McKinnon joins the special concurrence Opinion of Justice Sandefur.


/S/ LAURIE McKINNON