FILED

01/10/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0562

DA 20-0562

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 3

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

ROBERT EARL STAUDENMAYER,

       Defendant and Appellant.

APPEAL FROM:   District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DC 19-71
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

         Karl Pitcher, Attorney at Law, Missoula, Montana

      For Appellee:

         Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

         Steven N. Eschenbacher, Lake County Attorney, Benjamin R.
Anciaux, Deputy County Attorney, Polson, Montana

         Submitted on Briefs: October 5, 2022

          Decided: January 10, 2023

Filed:

_____
          Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Robert Staudenmayer appeals his bail-jumping conviction in the Twentieth Judicial District, Lake County. He argues that the trial court violated his constitutional right to confrontation when it admitted the clerk of court's minute entries stating Staudenmayer was present at his arraignment but absent from his omnibus hearing. Alternatively, Staudenmayer argues that the court abused its discretion by denying his motion to continue the trial date when he was assigned new counsel with only one month remaining until trial. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In October 2018, Lake County prosecutors charged Staudenmayer with theft, money laundering, and robbery. Lake County District Court Judge James Manley ordered Staudenmayer to appear in person for his arraignment and at all subsequent hearings; upon failure to appear, Staudenmayer's bond and release would be revoked and an arrest warrant issued. Staudenmayer appeared at his arraignment on November 14, 2018, and pleaded not guilty. Deputy Clerk Krisstyn Leiter wrote a minute entry summarizing the arraignment hearing. The entry stated, "Defendant present with Counsel Ashley Morigeau." The entry also stated that an omnibus hearing was set for March 13, 2019.

¶3 Staudenmayer did not appear at the March 13 omnibus hearing. Deputy Clerk Leiter again wrote a minute entry. This entry stated, "Defendant not present, represented by Counsel Ashley Morigeau." The entry also relayed, "Ms. Morigeau has no information on the non-appearance of her client."

2

¶4 Less than a week after Staudenmayer failed to appear at his omnibus hearing, Lake County prosecutors charged him with bail-jumping, in violation of § 45-7-308, MCA. The trial court issued an arrest warrant and set trial for the bail-jumping charge for December 2, 2019. In September 2019, however, the State moved to dismiss the charge as part of a plea deal with Staudenmayer in the theft case. The trial court dismissed the charge.

¶5 In March 2020, the State refiled the bail-jumping charge because Staudenmayer withdrew his plea in the theft case. The trial court again issued an arrest warrant and attorney Lisa Kauffman was appointed to represent Staudenmayer. The court set trial for August 31, 2020. Following Staudenmayer's substitution of judge, the new presiding judge ordered the trial moved up to June 29, 2020.

¶6 On June 10, 2020, the court granted Kauffman's motion to withdraw as counsel and reset trial for July 13, 2020. On June 15, 2020, the Office of Public Defender filed notice that Staudenmayer's case was reassigned to Amanda Gordon and Timothy Wenz. Nine days later, Staudenmayer's new counsel filed a motion to continue the July 13 trial, citing their recent appointment, their lack of received discovery, and an outbreak of COVID-19 that prevented them from speaking with Staudenmayer in person. Gordon and Wenz's motion indicates they learned of their appointment on June 3, 2020. The State opposed the motion, arguing that discovery was provided, that counsel was able to contact Staudenmayer via phone, and that bail-jumping was a simple charge requiring less preparation. The court denied the continuance, reasoning that there already had been four trial settings and that any further delay would prejudice the State.

3

¶7　Before trial, Staudenmayer filed a motion in limine to exclude testimony about the minute entries at trial, arguing that the State's proposed witness, District Court Clerk Lyn Fricker, did not write the minute entries and had no personal knowledge as to their contents. Staudenmayer also argued that admission of the minute entries violated his confrontation right. The trial court allowed Fricker to testify and ruled that the minute entries could be introduced if the State laid the proper foundation. The court explained that "[c]ourt and counsel routinely rely on minute entries in the course of a case," and that although minute entries can contain errors, it is up to the parties to notify the court of error before the court makes an evidentiary ruling.

¶8　The case proceeded to trial as scheduled on July 13, 2020. Before opening statements and during trial, Staudenmayer continued to object to admission of the minute entries. He contended that the minute entries were testimonial hearsay, the admission of which would violate the Confrontation Clause because Leiter—their author—was not available to testify. The trial court again acknowledged that minute entries may contain errors but that, in the court's experience, it did not happen often. The court stated, "These minute entries are made by the clerks of court for the purpose of making essentially a documentation of the Court's rulings at the time." The court admitted the minute entries as business records.

¶9　The jury convicted Staudenmayer of bail-jumping. The trial court sentenced him to ten years in prison with no time suspended and made him ineligible for parole.

**STANDARDS OF REVIEW**

¶10    We review de novo a trial court's interpretation of the Sixth Amendment to the United States Constitution. *State v. Mizenko*, 2006 MT 11, ¶ 8, 330 Mont. 299, 127 P.3d 458. We review for abuse of discretion a trial court's ruling on a motion to continue. *State v. Molder*, 2007 MT 41, ¶ 19, 336 Mont. 91, 152 P.3d 722.

**DISCUSSION**

¶11    *1. Did the trial court violate Staudenmayer's confrontation right by introducing Leiter's minute entries into evidence without subjecting her to cross-examination?*

¶12    Staudenmayer argues the trial court violated his confrontation right by admitting the minute entries into evidence because he did not have the opportunity to cross-examine their author, Deputy Clerk Leiter. We address first the application of state evidentiary rules and then the admissibility of the minute entries under the Confrontation Clause.

¶13    Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M. R. Evid. 801(c). The clerk's minute entries contained two statements that Leiter recorded prior to Staudenmayer's bail-jumping trial and were offered by the State to prove what they asserted—(1) that Staudenmayer was present at his arraignment where he was informed about the upcoming omnibus hearing and the requirement he attend; and (2) that Staudenmayer was absent from his omnibus hearing. The statements are hearsay.

¶14    Hearsay statements are inadmissible unless they meet a hearsay exception. M. R. Evid. 802. One exception is the public records exception, which allows admission of "records, reports, statements, or data compilations in any form of a public office or

agency setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report . . . ." M. R. Evid. 803(8).

¶15 Though both parties and the trial court described the minute entries as business records, the minute entries fall within the public records hearsay exception. District court clerks have a statutory duty to keep a minute book containing the daily proceedings of court. Section 3-5-501(1)(g), MCA. Their entries set forth the "regularly conducted and regularly recorded activities" of a public entity—the court—and thus are admissible under state evidentiary rules as public records. M. R. Evid. 803(8).

¶16 Nonetheless, "[a] hearsay statement is not unquestionably admissible just because it fits into a hearsay exception—the defendant's Sixth Amendment confrontation right remains a fundamental consideration that may not be infringed upon, state evidentiary rules aside." *State v. Laird*, 2019 MT 198, ¶ 83, 397 Mont. 29, 447 P.3d 416.

¶17 The Sixth Amendment's Confrontation Clause, applicable to state prosecutions via the Fourteenth Amendment, guarantees a criminal defendant's right "to be confronted with the witnesses against him." U.S. Const. amends. VI, XIV; *see also* Mont. Const. art. II, § 24 ("[T]he accused shall have the right . . . to meet the witnesses against him face to

face.").[1]  In *Crawford v. Washington*, the United States Supreme Court held that the Confrontation Clause prohibits admission of testimonial hearsay statements without opportunity for cross-examination.  541 U.S. 36, 59, 124 S. Ct. 1354, 1369 (2004).  In other words, the declarants of testimonial statements introduced into evidence must be subject to cross-examination, regardless of whether their statements are otherwise admissible under state evidentiary rules, such as a hearsay exception.  *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374.  Nontestimonial statements, on the other hand, do not implicate the confrontation right.  *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374; *accord Mizenko*, ¶ 32.

¶18    Deputy Clerk Leiter stated in the minute entries that Staudenmayer was present at his arraignment and absent from his omnibus hearing, but she did not testify at his bail-jumping trial.  Leiter's statements were introduced as evidence to prove the elements of bail-jumping. Section 45-7-308(1), MCA ("A person commits the offense of bail-jumping if, having been set at liberty by court order . . . upon condition that the person will subsequently appear at a specified time and place, the person purposely fails without lawful excuse to appear at that time and place.").  This case thus hinges on whether Leiter's statements are, as Staudenmayer argues, testimonial or, as the State argues, nontestimonial.

---

[1] The Confrontation Clause in the Montana Constitution has been interpreted to provide greater protection than the Confrontation Clause in the United States Constitution.  *State v. Clark*, 1998 MT 221, ¶¶ 20-25, 290 Mont. 479, 964 P.2d 766.  However, when a party "fails to articulate how his claim implicates any enhanced right afforded under the Montana Constitution," we analyze the state and federal constitutional claims together.  *State v. Porter*, 2018 MT 16, ¶ 17, 390 Mont. 174, 410 P.3d 955.  Staudenmayer cites both the state and federal constitutions but does not argue that his appeal implicates the enhanced protection of the Montana Constitution.  We thus analyze his state and federal confrontation claims together.

¶19　*Crawford* declined to define "testimonial" but listed a "core class" of testimonial statements: "*ex parte* in-court testimony"; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52, 124 S. Ct. at 1364 (citations omitted).

¶20　The Supreme Court later clarified that a statement cannot fall within the protection of the Confrontation Clause unless its "primary purpose" is testimonial. *Ohio v. Clark*, 576 U.S. 237, 244-46, 135 S. Ct. 2173, 2179-81 (2015). "[T]he question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Clark*, 576 U.S. at 245, 135 S. Ct. at 2180 (quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 1155 (2011)). "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Clark*, 576 U.S. at 245, 135 S. Ct. at 2180 (quoting *Bryant*, 562 U.S. at 359, 131 S. Ct. at 1155).

¶21　For example, in *Ohio v. Clark*, the Supreme Court concluded that a three-year-old boy's statements to his preschool teachers about who had abused him were not testimonial. 576 U.S. at 249, 135 S. Ct. at 2182. The teachers' purpose in questioning the boy was to protect the boy, not to gather evidence for prosecution. *Clark*, 576 U.S. at 247, 135 S. Ct. at 2181. Even though the teachers had a statutory duty to report abuse to law enforcement and even though this duty "had the natural tendency to result in . . . prosecution," the

8

statements were not *primarily* intended to be testimonial. *Clark*, 576 U.S. at 249-50, 135 S. Ct. at 2182-83.

¶22    The Supreme Court has used the primary purpose test to determine whether certain state laboratory reports were testimonial. In *Melendez-Diaz v. Massachusetts*, the Court considered three state laboratory certificates stating that material seized by police and connected to the defendant was cocaine of a certain quantity. 557 U.S. 305, 308, 129 S. Ct. 2527, 2531 (2009). The Court held that the certificates were testimonial because they were notarized affidavits asserting what the prosecution claimed and because, under Massachusetts law, their sole purpose was to provide prima facie evidence of a substance's composition, quality, and weight. 557 U.S. at 311, 129 S. Ct. at 2532. In *Bullcoming v. New Mexico*, the Court similarly held that a blood-alcohol-concentration report was testimonial because it was a formalized, signed document created solely for an evidentiary purpose. 564 U.S. 647, 665, 131 S. Ct. 2705, 2717 (2011).

¶23    This Court uses the primary purpose test to determine whether a statement is testimonial. *Porter*, ¶ 23; *see also State v. Spencer*, 2007 MT 245, ¶ 22, 339 Mont. 227, 169 P.3d 384. For example, in *City of Kalispell v. Omyer*, we held that driver's license suspension letters issued by the State Motor Vehicle Division were not testimonial because their primary purpose was the "administration of the MVD's affairs." 2016 MT 63, ¶ 24, 383 Mont. 19, 368 P.3d 1165. The letters were written to "notify drivers of a license suspension and to create a statutorily [ ] mandated database of driver's license records." *Omyer*, ¶ 24. Even though the letters eventually were used to convict the three defendants of driving with a suspended license, that was not why they had been written in the first

9

place. *Omyer*, ¶ 24. We reasoned that it is "realistic to presume that the vast majority of suspension letters, and other MVD documentation, exist within the agency's database and printed copies are never generated for purposes of criminal prosecutions." *Omyer*, ¶ 24.

¶24 The primary purpose of Leiter's statements was to aid the administration of the trial court by memorializing who was present in court. As noted, Montana law requires court clerks to "keep a minute book, which must contain the daily proceedings of court." Section 3-5-501(1)(g), MCA; *see also Int'l Ass'n, Local No. 8 v. Eighth Judicial Dist. Court*, 2002 MT 17, ¶ 18, 308 Mont. 183, 40 P.3d 396 (describing another clerk duty contained in the same statute—filing court orders—as "merely a ministerial function"). Clerks prepare minute entries for all hearings in all cases, civil and criminal, to record what the proceeding concerned, which parties were present, and the court's action. Like MVD's suspension letters, it is realistic to assume that most minute entries—even those in criminal cases—are never used in criminal prosecutions.[2] Leiter, adhering to her statutory duty, relayed Staudenmayer's attendance primarily for an administrative purpose.

---

[2] Justice McKinnon's Dissent distinguishes *Omyer* from this case in three ways. First, the Dissent points out that driver's license suspensions are civil matters, whereas Leiter's minute entries concern criminal matters. Dissent, ¶¶ 46-47. The distinction does not affect our confrontation analysis. There could be a testimonial statement made in a civil proceeding sought to be later used for criminal prosecution, like violating an order of protection. More importantly, the touchstone inquiry is whether the primary purpose of the statement was to create an out-of-court substitute for trial testimony, not whether the statement was made during a civil or criminal proceeding. *See Clark*, 576 U.S. at 245, 135 S. Ct. at 2180. Second, the Dissent contends that it would be more practical to require testimony from court clerks—who already are in the court—than from MVD custodians. Dissent, ¶¶ 46-47. *Melendez-Diaz* notes, however, that the Confrontation Clause does not yield to practical considerations of trial administration. 557 U.S. at 325, 129 S. Ct. at 2540 (disregarding the argument that requiring state laboratory analysts to testify would be too burdensome). Third, the Dissent argues that license suspension letters are more reliable than minute entries because their authors exercise less judgment and interpretation. Dissent ¶¶ 47-49. This line of argument strays too far from *Crawford*'s mandate. *Crawford* overruled *Ohio v.*

¶25 As it was a routine part of her administrative record-keeping duties, Leiter did not record Staudenmayer's attendance for the primary purpose of prosecuting Staudenmayer for bail-jumping. Even if a clerk's minute entry stating a party's absence may have the "natural tendency" to result in a prosecution for bail-jumping, a different primary purpose moots this point. *See Clark*, 576 U.S. at 250, 135 S. Ct. at 2183; *see also Melendez-Diaz*, 557 U.S. at 324, 129 S. Ct. at 2539-40 ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial."); *Crawford*, 541 U.S. at 56, 124 S. Ct. at 1367 (suggesting that business records historically were nontestimonial by their nature because they are not prepared with an eye toward trial).

¶26 Leiter's minute entries are distinguishable from laboratory reports whose admission we and the United States Supreme Court have found to be testimonial. In *State v. Clark*, for example, we held that the admission of a state crime laboratory report (and the then-explicit hearsay exception for such reports in the Montana Rules of Evidence) violated the Confrontation Clause in the Montana State Constitution. *Clark*, ¶ 25. In that case, the State directed a crime laboratory to create a report chemically analyzing alleged drugs

_____

*Roberts*, which held that evidence with "particularized guarantees of trustworthiness" was admissible without confrontation. *Crawford*, 541 U.S. at 60, 124 S. Ct. at 1369. The Supreme Court rejected this "indicia of reliability" approach and instead looked to whether a statement was testimonial. *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364. We need not consider whether a clerk's expanded discussion in a minute entry of what was said by whom could be considered testimonial. What we consider here is Leiter's record of attendance—a routine component of recording a proceeding, written for the primary purpose of court administration.

taken from the defendant after he had been arrested and charged with criminal drug possession offenses. *Clark*, ¶ 9. But here, Staudenmayer was not under investigation or being prosecuted for bail-jumping when Leiter created the minute entries relating his attendance and absence. And, unlike the reports in *Melendez-Diaz* and *Bullcoming*, which were produced primarily for evidentiary purposes, Leiter wrote the minute entries primarily for administrative purposes.

¶27 Staudenmayer additionally argues that the omnibus hearing minute entry violated the Confrontation Clause because it contained a testimonial hearsay statement from his previous defense attorney, Ashley Morigeau, who did not testify. Even assuming Staudenmayer raises a plausible constitutional argument regarding the Morigeau statement, we conclude that any error by the trial court in admitting the statement was harmless.

¶28 "A constitutional deprivation of the defendant's confrontation right is a trial error and is subject to harmless error review." *State v. Mercier*, 2021 MT 12, ¶ 31, 403 Mont. 34, 479 P.3d 967. Errors are harmless if "the fact-finder was presented with admissible evidence that proved *the same facts as the tainted evidence proved*." *State v. Van Kirk*, 2001 MT 184, ¶ 43, 306 Mont. 215, 32 P.3d 735 (emphasis in original). If the tainted evidence goes to an element of the crime charged and is the only evidence tending to prove that element, we are compelled to reverse. *State v. Martell*, 2021 MT 318, ¶ 17, 406 Mont. 488, 500 P.3d 1233. If there is admissible evidence on the same element, the State must demonstrate "that the *quality* of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction." *Martell*, ¶ 17 (quoting *Van Kirk*, ¶ 44 (emphasis in original)).

¶29 Bail-jumping consists of two elements: (1) being set at liberty by court order, upon condition of appearance at a specified time and place; and (2) failing without lawful excuse to appear at that time and place. Section 45-7-308(1), MCA. The omnibus minute entry relayed the following statement from Staudenmayer's attorney, "Ms. Morigeau has no information on the non-appearance of her client." Staudenmayer argues that this statement goes towards proving the second element of bail-jumping and "was most persuasive of all because it directly stated [Staudenmayer] had no lawful excuse for not appearing, or at least that he never provided such an excuse to his attorney."

¶30 The State introduced at least three other pieces of evidence, beyond Morigeau's statement, to prove that Staudenmayer failed without lawful excuse to appear at his omnibus hearing. First, the minute entry stated, "Defendant not present." Second, Contessa Hines, a long-term acquaintance of Staudenmayer, testified that Staudenmayer had called her and confirmed that he was "on the run." Third, District Court Clerk Lyn Fricker testified that while parties sometimes call the clerk's office to say that they will be unable to attend their hearing, Staudenmayer had made no such call.

¶31 Morigeau's statement, to the extent it could have suggested the lack of excuse, was cumulative. Hines's and Fricker's testimonies and the minute entry statement about Staudenmayer's nonappearance all tended to show that Staudenmayer failed without lawful excuse to appear at his omnibus hearing. Qualitatively, Morigeau's statement added nothing different; it contained no specific evidence about an excuse or lack thereof, simply that she had no information. From our review of the record, the jury was presented with admissible evidence that proved the same facts as the possibly tainted statement by

13

Morigeau proved. The State met its burden to show that, "when compared to the permissible trial evidence, 'the quality of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction.'" *Martell*, ¶ 26 (quoting *Van Kirk*, ¶ 44).

¶32 We conclude that the trial court did not violate Staudenmayer's confrontation right by admitting the minute entries.

¶33 *2. Did the trial court abuse its discretion in denying Staudenmayer's motion to continue the trial?*

¶34 Staudenmayer argues that the trial court abused its discretion by denying his motion to continue the trial because he had just been assigned new counsel, the trial was only one month away, and counsel had been able to meet with him only by phone. He asserts that his counsel made multiple "blunders" that could have been avoided had they been afforded the requested additional month to prepare. The alleged errors included not interviewing Morigeau and Leiter, not obtaining a transcript of the hearing, and not objecting to a "non-public trial." Staudenmayer also asserts that the State's last-minute substitution of exhibits prejudiced his defense because his counsel did not have sufficient time to respond. The State responds that the trial court's denial of the continuance was within the court's discretion and that the court made accommodations to address defense counsel's concerns while balancing Staudenmayer's speedy trial rights and the public health dangers presented by the COVID-19 pandemic.

¶35 "This Court will not overturn a district court's decision to deny a continuance 'unless the district court abused its discretion and the ruling prejudices the defendant.'"

14

*State v. Duncan*, 2008 MT 148, ¶ 37, 343 Mont. 220, 183 P.3d 111 (quoting *State v. Ibarra-Salas*, 2007 MT 173, ¶ 13, 338 Mont. 191, 164 P.3d 898). "Abuse of discretion occurs if the district court acted arbitrarily and without the employment of conscientious judgment or in a manner that exceeds the bounds of reason, resulting in substantial injustice." *Mercier*, ¶ 12.

¶36 Montana law provides that trial courts "may . . . order a continuance if the interests of justice so require." Section 46-13-202(2), MCA. "All motions for continuance are addressed to the discretion of the trial court and must be considered in the light of the diligence shown on the part of the movant." Section 46-13-202(3), MCA. Trial courts must construe such motions "to the end that criminal cases are tried with due diligence consonant with the rights of the defendant and the prosecution to a speedy trial." Section 46-13-202(3), MCA. When reviewing a trial court's denial of a continuance, we consider factors such as:

> the length of the requested delay, whether there was a showing that the State's case would be prejudiced, the reasons for the requested continuance, whether defense counsel was diligent in preparation for trial, whether the defendant's right to a speedy trial would be violated, and the defendant's right to effective assistance of counsel.

*Molder*, ¶ 23.

¶37 Here, Staudenmayer requested a reasonable one-month delay for the valid reason that he had just been appointed new counsel. Though we do not necessarily share the trial court's view that the changes in counsel from the public defender's office should bear on the good cause inquiry, the court did not deny the motion on this basis alone. It also weighed Staudenmayer's right to a speedy trial and prejudice to the State. In its orders

15

addressing the parties' motions in limine, the court reaffirmed its reasoning for denying the continuance, acknowledging the long pendency of the case and the simplicity of both the State's case and Staudenmayer's defense. Just before trial, the court again raised the issue of the continuance. The court stated that it understood that Staudenmayer wanted to go forward with the trial "as soon as possible" and that the court wanted him "to have his day in court." The court noted that the omnibus hearing was "so long ago;" it discussed how it had allowed the defense to file late motions and how those extensions "compromise[d] the State." During a discussion of witnesses to be called, the court asked the parties if they wanted to make any further record regarding witnesses and reminded the parties that, per its previous order, the court would pause the trial to allow parties to add witnesses. Staudenmayer's counsel did not raise any concerns that they had been unable to interview witnesses or obtain needed information in the month since assuming the case.

¶38 Staudenmayer, moreover, has not demonstrated how the court's denial prejudiced him. Staudenmayer relies on multiple alleged "blunders" to prove prejudice, but his assertions are pure speculation. There is no indication that interviews with Morigeau and Leiter or a transcript of the omnibus hearing would have provided evidence to support a theory of Staudenmayer's innocence. The month Staudenmayer's counsel had to prepare for trial was enough time for them to have interviewed Leiter and Morigeau and to have requested a transcript of the brief omnibus hearing, had they believed such evidence would have aided their client's defense. There is no indication that more time would have meant that Staudenmayer's counsel would have objected to a "non-public trial" or that such a motion would have merit. Finally, there is no indication that his counsel would have

16

opposed the substitution of exhibits (a substitution to which they acquiesced when given the choice by the trial court).

¶39 We conclude that the trial court did not commit reversible error when it denied Staudenmayer's motion to continue because Staudenmayer's substantial rights were not prejudiced. Staudenmayer has not explained how additional time would have provided counsel with a basis to raise different arguments that were likely to have changed the outcome of the trial. *See State v. Warnick*, 216 Mont. 102, 105-06, 699 P.3d 1049, 1051-52 (1985).

## CONCLUSION

¶40 For the foregoing reasons, Staudenmayer's conviction is affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

Justice Laurie McKinnon dissenting.

¶41 I dissent from the Court's Opinion on Issue 1. Because I would reverse on Issue 1 and remand for a new trial, I would not address Issue 2.

¶42 The statements in the minute entries were testimonial and implicate Staudenmayer's fundamental right of confrontation. As the Court acknowledges, while the minute entries are public records, "[a] hearsay statement is not unquestionably admissible just because it

17

fits into a hearsay exception—the defendant's Sixth Amendment confrontation right remains a fundamental consideration that may not be infringed upon, state evidentiary rules aside." *State v. Laird*, 2019 MT 198, ¶ 83, 397 Mont. 29, 447 P.3d 416. The right of confrontation is protected under both the United States Constitution and the Montana Constitution. U.S. Const. amend. VI; Mont. Const. art. II, § 24. It dictates that the reliability of evidence be "test[ed] in the crucible of cross-examination," and "reflects a judgment, not only about the desirability of reliable evidence . . . but about how reliability can best be determined." *Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 1370 (2004). Indeed, "[c]ross-examination is the hallmark of our system of justice because it produces truth." *State v. Clark*, 1998 MT 221, ¶ 23, 290 Mont. 479, 964 P.2d 766. A witness's demeanor, body language, and hesitancy in giving testimony "often communicate[s] as much to the fact-finder as the spoken words." *Clark*, ¶ 23. The ability to cross-examine witnesses "is a critical aspect of the right of confrontation." *Clark*, ¶ 22 (citation omitted).

¶43 The Court applies the primary purpose test to the omnibus minute entries and concludes that the minute entry relaying Staudenmayer's nonappearance is nontestimonial and does not implicate his right of confrontation. Opinion, ¶¶ 25, 32. The Court notes "that most minute entries—even those in criminal cases—are never used in criminal prosecutions." Opinion, ¶ 24. Instead, because clerks have a statutory duty to keep minute entries recording "what the proceeding concerned, which parties were present, and the court's action," their primary purpose is "to aid the administration of the trial court by memorializing" the proceedings. Opinion, ¶ 24. As to the minute entry containing a

18

statement from Staudenmayer's previous defense attorney, Ashley Morigeau, the Court declines to address whether the statement is testimonial, explaining that "[e]ven assuming Staudenmayer raises a plausible constitutional argument . . . we conclude that any error by the trial court in admitting the statement was harmless." Opinion, ¶ 27.

¶44 However, I would hold that both statements in the minute entries are testimonial. The minute entries were made under unique circumstances and are different in character than evidence we have previously considered under the primary purpose test.

¶45 First, the Court incorrectly analogizes minute entries to other forms of public records we analyzed under the primary purpose test. Opinion, ¶¶ 23-26. The Court explains that "in *City of Kalispell v. Omyer*, we held that driver's license suspension letters issued by the State Motor Vehicle Division were not testimonial because their primary purpose was" to aid the administration of the MVD's affairs by notifying drivers of license suspensions and creating a database of driver's license records as mandated by statute. Opinion, ¶ 23 (citing *City of Kalispell v. Omyer*, 2016 MT 63, ¶ 24, 383 Mont. 19, 368P.3d 1165). Although the letters were used in subsequent criminal prosecutions, "that was not why they had been written in the first place." Opinion, ¶ 23 (citing *Omyer*, ¶ 24).

¶46 While both driver's license suspension letters and minute entries are created according to a statutory duty, they have distinct differences. In *Omyer*, we recognized "that it would be unreasonable for a custodian of the department to be present in court each time a record was necessary for a trial." *Omyer*, ¶ 22 (citing *Billings v. Lindell*, 236 Mont. 519, 521, 771 P.2d 134, 136 (1989)). Because of these practical considerations, "various methods [were] developed by the Legislature through which authenticity is taken as

19

established for purposes of admissibility." *Omyer*, ¶ 22. For example, a statute requires the custodian to properly certify the suspension record is a true reproduction of the information stored by the Department of Justice. *Lindell*, 236 Mont. at 521, 771 P.2d at 136. In addition to practicality, a driver's license suspension is a civil, not criminal, proceeding. *Lancaster v. Dep't of Justice, Div. of Motor Vehicles*, 218 Mont. 97, 100, 706 P.2d 126, 128 (1985).

¶47 Minute entries are dissimilar to driver's license records and suspension letters. Driver's license records and suspension letters "exist within the agency's database and printed copies are never generated for purposes of criminal prosecutions." *Omyer*, ¶ 24. The custodian of the records merely attests to the authenticity of the reproduction of information contained in the database. Conversely, court clerks exercise their judgment in deciding the precise way information is recorded in minute entries. Court clerks may err when recording who is present. And recording proceedings may require a clerk to decide how to accurately synthesize and summarize events observed in real time. Staudenmayer has the right to cross-examine Leiter and Morigeau about what they observed and heard, as unlike the driver's license information stored in the department's database, the minute entry statements cannot speak for themselves. The practical considerations attendant to admitting State Motor Vehicle Division records are also nonexistent with minute entries. Court clerks can feasibly be required to testify regarding their minute entries when a party seeks to admit those entries into evidence. Here, the State called District Court Clerk Lyn Fricker to testify and lay the foundation for the admission of the minute entries instead of simply calling Deputy Clerk Krisstyn Leiter, the clerk who wrote the minute entries.

20

Finally, whereas driver's license records and suspension letters are civil matters, the minute entries here involved criminal matters and were created during official court proceedings.

¶48 Minute entries are also distinctly different than the filing of court orders, a duty we held was ministerial in *International Ass'n, Local No. 8 v. Eighth Judicial District Court*, 2002 MT 17, ¶ 17, 308 Mont. 183, 40 P.3d 396. Although the same statute, § 3-5-501, MCA, requires district court clerks to both file court orders and write minute entries, the duties are substantially different in character. As to filing court orders, although a trial judge's written judgment remains pending until filed with the clerk, "[t]he actual entry of the judgment by the clerk . . . is but a ministerial function and does not affect the validity of the judgment." *Int'l Ass'n, Local No. 8*, ¶ 17. A judgment binds "the parties at that point even though entered by the clerk" at a later date. *Int'l Ass'n, Local No. 8*, ¶ 18. The clerk's ministerial duty to file court orders does not affect the substance of the order, nor does it require the clerk to exercise her judgment, interpret events, or otherwise act as a witness to proceedings.

¶49 Taking court minutes, conversely, requires a clerk to observe official proceedings and exercise their independent judgment when recording those events. As the District Court acknowledged, "while I will agree that there have been errors in minute entries, quite frankly in the Court's experience that doesn't happen often . . . ." Memorializing court proceedings is not analogous to filing an order, an action which has no substantive impact on the order itself. Taking court minutes is not a merely ministerial function.

¶50 This is particularly evident when considering the testimonial hearsay statement from Staudenmayer's previous defense attorney, Ashley Morigeau, which contains two levels of

21

hearsay. Under M. R. Evid. 805, "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of a combined statement conforms with an exception to the hearsay rule provided in these rules." A witness's statement as to what someone else told another person is hearsay within hearsay. *State v. Daniels*, 210 Mont. 1, 10, 682 P.2d 173, 178 (1984). The minute entry relayed that "Ms. Morigeau has no information on the non-appearance of her client." This entry contains Leiter's statement regarding her interpretation and summation of Morigeau's statement to the judge, and despite neither Leiter nor Morigeau testifying, the entry was admitted in part to prove a necessary element of bail-jumping—lack of lawful excuse.

¶51 Finally, the Court distinguishes the minute entries from a state crime lab report we held violated the right of confrontation in *State v. Clark*. Opinion, ¶ 26 (citing *Clark*, ¶ 25). Whereas "the State directed a crime laboratory to create a report chemically analyzing alleged drugs taken from the defendant after he had been arrested and charged with criminal drug possession," in this case "Staudenmayer was not under investigation or being prosecuted for bail-jumping when Leiter" wrote the minute entries. Opinion, ¶ 26 (citing *Clark*, ¶ 9). However, our decision in *Clark* was rooted in the increased importance of the right of confrontation when analyzing substantive evidence, rather than the timing of the underlying prosecution. We explained "the chemical analysis of the drugs was a critical component of the State's case. The experience, background, and training of the technician, and the method and manner of tests conducted, are all matters which the defendant is entitled to explore through cross-examination in the presence of the fact-finder." *Clark*, ¶ 24. Like the lab report, the minute entries were a critical component of the State's case.

The minute entries were the only direct evidence admitted to prove Staudenmayer failed to appear at the omnibus hearing, and the entry relaying Morigeau's statement that she had no information on Staudenmayer's non-appearance was a critical piece of evidence admitted to prove Staudenmayer lacked a lawful excuse for his absence. Staudenmayer was entitled to cross-examine Leiter on her training, how she identifies what information to include, and her practices for recording that information, among other relevant matters.

¶52 Second, the Court's application of the primary purpose test to the minute entries is too strict and fails to consider "all of the circumstances" surrounding the statements. *Ohio v. Clark*, 576 U.S. 237, 244, 135 S. Ct. 2173, 2180 (2015).[1] To "evaluate challenged statements in context," some relevant factors may include a setting's formality, the spontaneity of the statements, and the declarant's identity, age, relationships to other witnesses, and familiarity with the criminal justice system. *Clark*, 576 U.S. at 245-49, 135 S. Ct. at 2180-82.

¶53 These factors informed the analysis in *Ohio v. Clark*, where the United States Supreme Court held out-of-court statements made by a three-year-old, abused child to investigating teachers were not testimonial. *Clark*, 576 U.S. at 247, 135 S. Ct. at 2181. In concluding that the primary purpose of the interrogation was to protect the student, the

---

[1] The Court asserts that in distinguishing minute entries from other statements analyzed under the primary purpose test, this Dissent improperly discusses the statements' reliability. Opinion, ¶ 24, n. 2. Certainly, *Crawford* rejected the "indicia of reliability" test. *Crawford*, 541 U.S. at 68-69, 124 S. Ct. at 1374. However, distinguishing minute entries from other statements ensures that all of the circumstances surrounding the statements are properly accounted for. This Dissent does not contend that minute entries are testimonial because they are unreliable; rather, understanding the full context in which minute entries are made is essential when determining the statements' primary purpose.

23

Supreme Court noted that the child did not know his statements "would be used to arrest or punish his abuser," and "the conversation between [the child] and his teachers was informal and spontaneous." *Clark*, 576 U.S. at 247, 135 S. Ct. at 2181. The Supreme Court emphasized the child's age, explaining that "[f]ew preschool students understand the details of our criminal justice system . . . . On the contrary, a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all." *Clark*, 576 U.S. at 247-48, 135 S. Ct. at 2181-82.

¶54 These same factors informed our analysis in *State v. Tome*, where we held a thirteen-year-old student's statements to an officer, a nurse, and a forensic interviewer regarding her abuse were testimonial because the circumstances of the interviews indicated their primary purpose was to gather evidence for a prosecution. *State v. Tome*, 2021 MT 229, ¶ 35, 405 Mont. 292, 495 P.3d 54. We distinguished the student's statements from those in *Clark*, noting that the interviews were not "informal and spontaneous" because they "came 24 to 48 hours after the alleged crime" when the report was already filed with law enforcement. Whereas the statements in *Clark* were made to teachers, in *Tome*, the statements "were made to law enforcement and other entities tasked with assisting in criminal prosecutions." *Tome*, ¶ 27. Additionally, the interviews were conducted at the student's home or in the presence of officers. *Tome*, ¶ 27. Finally, we noted that the student "had previously called law enforcement on her parents and therefore possessed at least some awareness of the purpose of law enforcement. The . . . reasoning in *Clark* that, due to their age, '[f]ew preschool students understand the details of our criminal justice

24

system[,]' does not apply here." *Tome*, ¶ 27 (quoting *Clark*, 576 U.S. at 247-48, 135 S. Ct. at 2181-82).

¶55 We have previously explained that the formality of the situation is relevant when determining a statement's primary purpose. *Laird*, ¶ 94. "A more formal setting—such as a formal station-house interrogation—'is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused.'" *Laird*, ¶ 94 (quoting *Clark*, 576 U.S. at 245, 135 S. Ct. at 2180). In *Laird*, we determined that an autopsy doctor's statements that he found evidence "troubling" during the autopsy were testimonial. *Laird*, ¶¶ 104-05. We explained that the statements were made in "sufficiently formal" circumstances because law enforcement officers requested and observed the autopsy, along with the coroner who "testified that one of his objectives" was to determine how the death occurred. *Laird*, ¶¶ 104-05. And while the doctor "had multiple, more general objectives in performing the autopsy," his "troubling" statement reflected his opinion of the injuries. *Laird*, ¶ 106. We concluded that the "primary purpose was to create an out-of-court substitute for trial testimony," and that the "State elicited and then utilized those statements as substitute for [the doctor's] testimony at trial." *Laird*, ¶ 106.

¶56 The minute entries were likewise made in a formal setting: a courtroom during an official proceeding. Notably, Morigeau's statement that she had no information on her client's whereabouts was made in response to the judge's question; the statement was elicited during a formal judicial proceeding. Moreover, Leiter's minute entry summarizing the interaction between Morigeau and the judge was substituted for Morigeau's testimony

at trial.  Additionally, a court clerk is intimately familiar with courtroom procedures and legal matters.  While the writing of minute entries in every case is undoubtably a statutory duty, and while Staudenmayer had not been charged with bail-jumping at the time, the court clerk understands that a defendant's absence and the defense attorney's statement that she had no information on her client's absence were critical facts that would likely result in Staudenmayer being charged with the offense of bail-jumping.  As we have recognized, statements may be "testimonial when their 'primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution.'"  *Omyer*, ¶ 23 (quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273-74 (2006)).

¶57    Accordingly, I disagree with the Court that the minute entry relaying Staudenmayer's nonappearance was nontestimonial.  I would hold that both statements in Leiter's omnibus minute entries were testimonial, and their admission into evidence violated Staudenmayer's right of confrontation under the Sixth and Fourteenth Amendments of the United States Constitution and Article II, Section 24, of the Montana Constitution.

¶58    Further, I disagree with the Court's conclusion that "any error by the trial court in admitting the [Morigeau] statement was harmless."  Opinion, ¶ 27.  Instead, I would find that the trial court's error in admitting both statements in the minute entries was not harmless and would reverse and remand for a new trial on the merits.

¶59    The State introduced the following evidence to prove Staudenmayer failed without lawful excuse to appear at his omnibus hearing: 1) the minute entry stating "Defendant not present"; 2) the minute entry relaying that "Ms. Morigeau has no information on the

26

non-appearance of her client"; 3) the testimony of Contessa Hines, Staudenmayer's acquaintance, that Staudenmayer called her and confirmed he was "on the run"; and 4) District Court Clerk Fricker's testimony that Staudenmayer did not call the clerk's office to report he would be unable to attend the hearing, as parties sometimes do.

¶60    As the Court explains, under harmless error review, "if the tainted evidence goes to an element of the crime charged and is the only evidence tending to prove that element, we are compelled to reverse."  Opinion, ¶ 28 (citing *State v. Martell*, 2021 MT 318, ¶ 17, 406 Mont. 488, 500 P.3d 1233).  If there is admissible evidence on the same element, the State must demonstrate "that the *quality* of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction." *Martell*, ¶ 17 (quoting *State v. Van Kirk*, 2001 MT 184, ¶ 44, 306 Mont. 215, 32 P.3d 735 (emphasis in original)).

¶61    The second element of bail-jumping requires the defendant to fail without lawful excuse to appear.  Section 45-7-308(1), MCA.  Excluding the statements contained in the minute entries, the remaining evidence as to this element consists of Hines's testimony that Staudenmayer called her and confirmed he was "on the run" and Fricker's testimony that Staudenmayer did not call the clerk's office to report he would be unable to attend the hearing.  Neither piece of evidence tends to prove a critical element of bail-jumping: that Staudenmayer did not appear at the omnibus hearing.  While Fricker's and Hines's testimony could support an inference that Staudenmayer failed to appear at his omnibus hearing, without the minute entry relaying Staudenmayer's nonappearance, the jury could have found that the State failed to prove Staudenmayer's absence.

27

¶62 Additionally, as to whether Staudenmayer had a lawful excuse for not appearing at the omnibus hearing, Hines's and Fricker's testimony is not qualitatively similar to the evidence contained in the minute entries. The minute entry containing Morigeau's statement that she had no information on Staudenmayer's nonappearance was a critical piece of evidence demonstrating that Staudenmayer lacked a lawful excuse for his absence. Fricker's testimony that Staudenmayer did not call could support an inference that he lacked a good excuse. However, defendants are not required to inform the clerk's office of their absence, and indeed Fricker testified that defendants do not always call. Hines's testimony that Staudenmayer told her he was on the run could similarly suggest that Staudenmayer lacked a lawful excuse for his absence. However, Hines testified that her conversation with Staudenmayer took place in July of 2020, not in March of 2019 when he was charged with bail-jumping. Moreover, when asked on cross-examination whether she had any personal knowledge of whether Staudenmayer missed a court date on purpose, Hines responded "Not even in the slightest." When asked on re-direct whether Staudenmayer gave Hines any excuse for missing court, Hines responded "[n]o. Why would he?" Without Morigeau's corroborating statement in the minute entries that she did not have any information on her client's absence, the jury could have found that the State failed to prove Staudenmayer's absence was unlawful. This minute entry was the best evidence establishing the second element of Staudenmayer's bail-jumping charge.

¶63 Ultimately, the jury was not presented with admissible evidence that proved the same facts as the tainted evidence proved. I would conclude that the State did not meet its high burden to show that there is no reasonable possibility that Hines's and Fricker's

28

testimony did not contribute to Staudenmayer's conviction. The court's error in admitting the minute entries was not harmless.

¶64 I dissent.

/S/ LAURIE McKINNON

Justice James Jeremiah Shea and Justice Ingrid Gustafson join in the dissenting Opinion of Justice McKinnon.

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON

Justice James Jeremiah Shea, dissenting.

¶65 I join in Justice McKinnon's dissent. Because I would reverse and remand for a new trial on that basis, this would render the District Court's error in denying Staudenmayer's request for a continuance moot. I nevertheless write separately because the Majority's conclusion that "the trial court did not commit reversible error when it denied Staudenmayer's motion to continue because Staudenmayer's substantial rights were not prejudiced," Opinion, ¶ 39, bears discussion in its own right.

¶66 The Majority fails to clarify whether it is holding the District Court did not abuse its discretion when it summarily denied Staudenmayer's motion for a continuance with no substantive discussion or analysis, or whether the District Court did abuse its discretion, but the error was harmless "because Staudenmayer's substantial rights were not prejudiced." Although the outcome remains the same either way, the point warrants clarification for precedent purposes. The abuse of discretion in this case is self-evident

29

when the entirety of the District Court's reasoning for denying the continuance was contained in one sentence: "Defendant is now on his Fourth Jury Trial Setting, any further delay prejudices the State." From that sentence, the Majority concludes that the District Court "weighed Staudenmayer's right to a speedy trial and prejudice to the State." Opinion, ¶ 37.[1] But there is nothing in the record or the District Court's cursory order to indicate that the District Court actually "weighed" anything.

¶67 The District Court did not weigh Staudenmayer's right to a speedy trial—it merely observed that the matter was on its fourth trial setting. In that regard, it bears noting that Staudenmayer's requested continuance would have resulted in a trial date *before* the August 31, 2020 trial date that had previously been set before the new presiding judge moved the trial up two months. And even if there was anything in the record to suggest that the District Court actually weighed Staudenmayer's speedy trial rights in denying his motion for a continuance, this would not have provided a basis to deny Staudenmayer's request for a continuance. We have held that "[t]he right to a speedy trial was primarily designed to protect defendants from oppressive tactics by the prosecution. Thus, case law demonstrates that it is the defendant's prerogative to assert or waive the prescribed right." *State v. Garcia*, 2003 MT 211, ¶ 29, 317 Mont. 73, 75 P.3d 313 (internal citation omitted).

---

[1] The Majority also observes that "[j]ust before trial, the court again raised the issue of the continuance. The court stated that it understood that Staudenmayer wanted to go forward with the trial 'as soon as possible' and that the court wanted him 'to have his day in court.'" Opinion, ¶ 37. The Majority then appears to fault Staudenmayer's counsel for not raising concerns about their inability to interview witnesses or obtain needed information in the month since assuming the case. Opinion, ¶ 37. To be clear, the District Court was not revisiting or reconsidering the issue of the continuance that it had already denied, nor was it indicating any willingness to do so. It merely observed that Staudenmayer had moved for a continuance within the context of a discussion about reducing preliminary juror challenges.

The implications of waiving the right to a speedy trial should not factor into a trial court's deliberations on a defendant's motion to continue. *Garcia*, ¶ 30. So this leaves prejudice to the State as the sole reason upon which the District Court ostensibly based its denial of the requested continuance. But this reason is indisputably without a basis in light of the fact that the State did not even assert it would be prejudiced by the continuance.

¶68 The Majority concludes that "Staudenmayer requested a reasonable one-month delay for the valid reason that he had just been appointed new counsel." Opinion, ¶ 37. On that point, I agree. All of the factors we set forth in *Molder* indicate that the motion should have been granted. *Molder*, ¶ 23. And yet the Majority concludes that Staudenmayer was not prejudiced by the denial of his continuance, concluding: "There is no indication that interviews with Morigeau and Leiter or a transcript of the omnibus hearing would have provided evidence to support a theory of Staudenmayer's innocence." Opinion, ¶ 38. But the inverse is equally true: there is no indication that the interviews or transcript would *not* have supported Staudenmayer's innocence. And that is precisely the point. The reason Staudenmayer cannot demonstrate to what extent his defense was prejudiced by the *lack* of this evidence is because his attorneys never received the time requested to develop that evidence. To take but one example, the District Court acknowledged that the minute entries may contain errors. Had Staudenmayer's counsel received adequate time to prepare, they could have obtained the actual transcript from the omnibus hearing—an indisputably more reliable record of the proceeding—or interviewed Leiter, the author of the minute entries, to determine their accuracy. Yet Staudenmayer's

31

counsel was never able to challenge the accuracy of the minute entries, a key component of Staudenmayer's defense.

¶69 The Majority characterizes Staudenmayer's assertion of prejudice from the litany of "blunders" his trial counsel made as being "pure speculation." But the Majority then asserts that "[t]he month Staudenmayer's counsel had to prepare for trial was enough time for them to have interviewed Leiter and Morigeau and to have requested a transcript of the brief omnibus hearing, had they believed such evidence would have aided their client's defense." Opinion, ¶ 38. This begs the question: Who is really doing the speculating here? It is not as if Staudenmayer was the public defender's only client. Those in the trenches on both sides recognize that too often they have to play the hand they're dealt, and sometimes that means foregoing witness interviews and requesting transcripts for no other reason than there is not enough time. We do a disservice to the system itself when we ignore this reality. The hand that Staudenmayer's newly appointed counsel was dealt was the denial of "a reasonable one-month delay" to adequately prepare for trial. Yet in holding that Staudenmayer was *not* prejudiced by his counsel's inadequate preparation time, the Majority employs the circular reasoning that Staudenmayer's counsel's failure to develop evidence proves that they must not have believed "such evidence would have aided their client's defense." Opinion, ¶ 38.

¶70 "Staudenmayer requested a reasonable one-month delay for the valid reason that he had just been appointed new counsel." Opinion, ¶ 37. The District Court's denial of this reasonable request prejudiced Staudenmayer because his newly appointed counsel did not have the benefit of the requested time that they determined was necessary to prepare for

32

trial. The District Court committed reversible error when it denied Staudenmayer's motion for a continuance.

/S/ JAMES JEREMIAH SHEA

Justice Ingrid Gustafson and Justice Laurie McKinnon join the dissenting Opinion of Justice Shea.

/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON