FILED

12/27/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0587

DA 21-0587

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2023 MT 251

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JOSE MARTINEZ, JR.,

      Defendant and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Thirteenth Judicial District, In and For the County of Yellowstone, Cause No. DC-19-674 Honorable Gregory R. Todd, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

           Chad Wright, Appellate Defender, James Reavis, Assistant Appellate Defender, Helena, Montana

      For Appellee:

           Austin Knudsen, Montana Attorney General, Michael P. Dougherty, Assistant Attorney General, Helena, Montana

           Scott Twito, Yellowstone County Attorney, Sarah L. Hyde, Jacob Yerger, Deputy County Attorneys, Billings, Montana

                    Submitted on Briefs:  October 25, 2023

                              Decided:  December 27, 2023

Filed:

                              _____
                                      Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     A jury convicted Jose Martinez Jr. (Martinez) in the Thirteenth Judicial District Court, Yellowstone County, of two counts of incest, criminal distribution of dangerous drugs, solicitation to commit tampering with witnesses or informants, and three counts of criminal contempt.  Martinez appeals.

¶2     We restate the issue as follows:

*Were statements made by S.M. to a Sexual Assault Nurse Examiner (SANE) and a physician testimonial evidence admitted in violation of Martinez's right of confrontation?*

¶3     We conclude that S.M.'s statements to a physician which were admitted at trial when S.M. was not present to testify were nontestimonial and made for purposes of medical treatment.  Accordingly, S.M.'s statements to a medical provider were admissible pursuant to M. R. Evid. 803(4).  We further conclude that S.M.'s statements to the SANE were testimonial and their admission thus violated Martinez's right of confrontation when he had no opportunity for cross-examination.  The error, however, was harmless given other evidence produced at trial and because the SANE's testimony was cumulative.

¶4     Martinez's conviction is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

¶5     The charges in this case arose following a report from Martinez's stepdaughter, S.M., that Martinez had been sexually abusing her since she was 10.  Prior to the report, Martinez was living in a Billings motel with S.M. and her mother, T.M., to whom Martinez was married.  S.M., who was 16 years old at the time of her report, had stopped attending

2

school in 2018. Instead, she remained home alone with Martinez while T.M. was at work. On September 27, 2018, S.M. was speaking with a friend who overheard Martinez "say nasty stuff" to S.M. like "horny" and "are you ready." Concerned for S.M.'s safety, the friend urged S.M. to tell someone. S.M. then told her sister that Martinez had been sexually assaulting her. Her sister contacted T.M. who confronted Martinez. Martinez denied the accusation and T.M. took S.M. and left the motel.

¶6 T.M. called 911 and reported that she had "just found out some really sad news" concerning Martinez and her daughter. T.M. said that her 16-year-old daughter told her that her stepdad had been molesting her. Law enforcement dispatched Officer Holly Newsome to speak with T.M. Officer Newsome inquired whether S.M. needed medical attention and, in consultation with T.M., determined S.M. should go to the Billings Clinic for a SANE examination. Nurse Susan Woods conducted the SANE examination. Prior to the examination, S.M. and T.M. signed a Patient Consent Form. The Consent Form allowed for the collection of evidence of a sex crime and authorized the release of collected evidence to law enforcement. Just above the signature line the form notes that "I understand that this is not a routine medical checkup, and that the clinician doing the exam will not be held responsible for identifying, diagnosing, or treating any existing medical problems." By signing the form, S.M. "expressly authoriz[ed] the use of such information/evidence in any subsequent criminal proceedings against the assailant(s)."

¶7 As part of the examination, Nurse Woods conducted a "patient narrative" in which S.M. described her injuries and how she sustained them. S.M. stated that Martinez began

3

"doing stuff to [her] when [she] was 10 years old." She also told Nurse Woods that she learned she was pregnant with Martinez's baby in May of 2018 after she missed her period and took a pregnancy test. S.M. explained that Martinez took her to Planned Parenthood for an abortion and then made her go on the birth control drug, Depo-Provera. During the physical portion of the examination, Nurse Woods documented injuries she observed to S.M.'s inner labia which she characterized as "abnormal." She noted that "skin wouldn't be broken in that area naturally, without trauma." Finally, Nurse Woods collected S.M.'s clothing, swabbed her vagina for DNA evidence, and photographed her genital area. She also took samples of S.M.'s blood and urine.

¶8     While at the hospital, S.M. provided a statement to Officer Newsome in which she identified Martinez as the suspect. She stated that Martinez would place a towel on the bed prior to having sex with her in order "to keep things clean. . . ." She also reported that Martinez would force her to shower and douche after sex to remove evidence. S.M. said she was currently on birth control which Martinez had forced her to take so that he would not have to wear a condom. Additionally, S.M. indicated Martinez often gave her pain pills that he had which made her feel tired. Following these statements, Officer Newsome returned to the motel to speak with Martinez.

¶9     During questioning, Martinez denied having any knowledge that S.M. was sexually active but contradicted this when he admitted to taking S.M. to Planned Parenthood so that she could obtain an abortion. He also stated that he was currently taking pain pills and indicated that he had given S.M. one that day. However, he later retracted that statement.

4

Oxycodone was later found in Martinez's motel room during a search by law enforcement. A douche bottle and towels were also recovered.

¶10 Several days after the SANE examination, S.M. was seen by Dr. Cynthia Brewer for follow up care. Dr. Brewer is a family medicine physician in the Billings Clinic and the director of several programs, including the SANE team. S.M. explained to Dr. Brewer during her medical visit on October 2, 2018, that her friend had overheard Martinez saying things to her of a sexual nature and told S.M. she must tell somebody. S.M. told her older sister, who told T.M. S.M. disclosed to Dr. Brewer that Martinez had been sexually abusing her since she was 10 years old; that she bled when Martinez was "rough" with her; that she had urinary tract infections; that Martinez gave her pills which would make her sleep; that she became pregnant with Martinez's child and Martinez took her to Planned Parenthood for an abortion; and that Martinez made her go on birth control after the abortion so that he could ejaculate inside of her.

¶11 Dr. Brewer's physical examination of S.M. revealed significant thickening and white scar tissue along the hymen and redness, thickening, and white discoloration on the vulva. Dr. Brewer concluded these injuries were clinically diagnostic for child abuse and consistent with a history of blunt force penetration. Dr. Brewer treated S.M. for a yeast infection, ordered further STI testing, and referred S.M. to a trauma based therapist. She also scheduled S.M. for a primary care appointment.

¶12 On November 27, 2018, Dr. Brewer again saw S.M. after she passed out and was admitted to the pediatric ICU. S.M. was diagnosed with a severe eating disorder and

5

anemia, which required a blood transfusion. Dr. Brewer was concerned for S.M.'s safety because she believed S.M. was suicidal and experiencing symptoms of post-traumatic stress disorder. Dr. Brewer explained that S.M.'s periods had become heavier than normal and asked S.M. if she wanted to be placed back on Depo-Provera. S.M. became very upset and told Dr. Brewer that Martinez had her take Depo-Provera so that he could ejaculate inside of her.

¶13 Billings Police Detective Jeremy Dennler (Det. Dennler) became the lead investigator in the case and continued the investigation. Det. Dennler obtained S.M.'s medical records from Planned Parenthood confirming that on May 16, 2018, S.M. was brought to the Heights Planned Parenthood by Martinez for an abortion. T.M. was not there. Det. Dennler also observed S.M.'s forensic interview conducted by Billings Police Detective Wichman. Det. Dennler later would explain to the jury the substance of the forensic interview:

> Q: Can you describe those details?
> A: She described the sexual abuse starting at the age of 10 by Mr. Martinez, and he would abuse her upwards of twice a day while her mother was at work. And he would have care of her before school and then care of her after school. And over a period of time, if you were to do the math, what was shocking about that was that upwards of hundreds if not thousands of episodes of abuse that she sustained. She was able to describe the particular method that he preferred to have sexual intercourse. He would have her, you know, lay on her back or he would remove her underwear, her pants. He would remove his pants. And he would begin to have sexual intercourse with her with his arms up underneath her knees, pushing them forward. He'd have a ritual. He'd lay a towel down to protect the bedding from any biological fluids that maybe spilled. Afterwards, he'd make her shower and use the douche to clean herself to eliminate any traces that he'd been having sex with her. He threatened her that, "If you tell your mom about this, she's going to take you and send you away. She's not going to love you anymore." She

was able to describe, at first, the sexual abuse. He would not ejaculate in her vagina. He would remove his penis prior to that. But after the abortion procedure, she was placed on Depo Provera, a birth control injection. So then he was able to ejaculate in her vagina without fear that she was going to be impregnated again. She was able to describe white fluid on the inside of her thighs after sexual intercourse and that, you know, if she tried to refuse, Mr. Martinez would become angry, isolate her in her room. So those types of -- you know, the overall was pretty shocking to hear.

Q: Detective Dennler, was anything -- was any statement made in that interview inconsistent with what you had read in the SANE report?

A: No.

¶14 On May 31, 2019, the State filed an Information charging Martinez with three counts of incest. Martinez was arrested in June 2019 and ordered to have no contact with T.M. or S.M. While incarcerated, he contacted T.M. on two occasions urging her and S.M. to "switch up" and "do what I told you" to do. The Information was subsequently amended to include one count of criminal distribution of dangerous drugs, one count of solicitation to tamper with witnesses or informants, and three counts of criminal contempt. Prior to trial, the State informed the court that S.M. and T.M. had been served with subpoenas but indicated that they would not be appearing. The State sought a pretrial ruling on the admissibility of statements made by S.M. to Nurse Woods and Dr. Brewer. The State argued S.M.'s statements were nontestimonial and therefore their admission did not violate Martinez's confrontation rights. The State maintained the statements were admissible under M. R. Evid. 803(4), as statements to a medical provider for purposes of treatment. Martinez objected and argued that S.M.'s statements were testimonial under both state and federal constitutions.

¶15 The District Court conducted a pretrial hearing during which Officer Newsome, Nurse Woods, and Dr. Brewer testified. Ultimately, the District Court held the State could introduce S.M.'s statements to Nurse Woods and Dr. Brewer because they were nontestimonial and they met the exception under M. R. Evid. 804(4) as the statements were made "primarily for purposes of medical treatment or diagnosis, and not as a substitute for trial testimony."

¶16 A jury trial commenced April 9, 2021. Prior to trial, Martinez filed a brief observing the court's pretrial ruling and adding, "It is anticipated that portions of all the interviews of S.M. and T.M. will become a part of the testimony of various witnesses. There likely will be no objection to that testimony." The court noted a standing objection from Martinez regarding the testimony of Nurse Woods and Dr. Brewer. During trial, neither S.M. or T.M. appeared and the State introduced the statements S.M. made to Nurse Woods and Dr. Brewer. Officer Newsome and Det. Dennler also testified, without objection. Both testified about the statements made by S.M. detailing the abuse and S.M.'s abortion. S.M.'s blood results and urine tests were admitted into evidence, along with her clothes, towels, and the douche bottle. Lacey Van Grinsven, a forensic scientist at the crime lab testified that she found seminal fluid on S.M.'s underwear and spermatozoa on the douche bottle, but the evidence was otherwise inconclusive as to Martinez, likely because of the small sample size. T.M.'s 911 call identifying Martinez as the abuser was also admitted into evidence without objection.

¶17    The jury convicted Martinez on seven of the eight counts and acquitted him on one count of incest. The District Court sentenced Martinez to 40 years at Montana State Prison, with a 20-year parole restriction. The counts were run concurrently and Martinez was given credit for 832 days of time served.

## STANDARD OF REVIEW

¶18    This Court reviews "a district court's conclusions of law and interpretations of the constitution de novo." *State v. Porter*, 2018 MT 16, ¶ 14, 390 Mont. 174, 410 P.3d 955. "This Court's review of constitutional questions is plenary and we therefore review de novo a district court's interpretation of the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution." *State v. Tome*, 2021 MT 229, ¶ 17, 405 Mont. 292, 495 P.3d 54. "Whether evidence is relevant and admissible is left to the sound discretion of the district court and will not be overturned on appeal absent an abuse of discretion." *Porter*, ¶ 14 (quoting *State v. Whipple*, 2001 MT 16, ¶ 17, 304 Mont. 118, 19 P.3d 228). "A determination that M. R. Evid. 803(4) allows certain hearsay testimony to be admitted is an evidentiary issue reviewed for abuse of discretion." *Porter*, ¶ 14.

¶19    "A constitutional deprivation of the defendant's confrontation right is a trial error and is subject to harmless error review." *State v. Mercier*, 2021 MT 12, ¶ 31, 403 Mont. 34, 479 P.3d 967. The Court considers "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, and the presence or absence of

evidence corroborating or contradicting the testimony of the witness on material points." *Mercier*, ¶ 31.

## DISCUSSION

¶20 Martinez argues on appeal that his constitutional right to confront witnesses was violated when S.M.'s statements made during her SANE examination and to Dr. Brewer were admitted without him having an opportunity to cross-examine her about those statements.

¶21 "The Sixth Amendment's Confrontation Clause, applicable to state prosecutions via the Fourteenth Amendment, guarantees a criminal defendant's right 'to be confronted with the witnesses against him.'" *State v. Staudenmayer*, 2023 MT 3, ¶ 17, 411 Mont. 167, 523 P.3d 29. Montana's Constitution likewise ensures the right of an accused "to meet the witnesses against him face to face. . . ." Mont. Const. art. II, § 24. The United States Supreme Court has held that "testimonial hearsay statements of witnesses absent from trial are inadmissible under the Confrontation Clause unless the declarant is unavailable and *the defendant had a prior opportunity for cross-examination*." *Tome*, ¶ 23 (emphasis in original) (citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004)). The Supreme Court adopted the "primary purpose" test in *Davis v. Washington* to differentiate between when a statement is testimonial in nature and when it is nontestimonial. 547 U.S. 813, 822, 126 S. Ct. 2266, 2273-74 (2006). The Supreme Court determined that statements are nontestimonial if they are "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the

interrogation is to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 822, 126 S. Ct. at 2273. Conversely, statements are "testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822, 126 S. Ct. at 2273-74. When determining a statement's primary purpose "the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 576 U.S. 237, 245, 135 S. Ct. 2173, 2180 (2015).

¶22 S.M.'s statements to Nurse Woods and Dr. Brewer must be evaluated separately to determine whether they are testimonial. Nurse Woods saw S.M. on one occasion immediately after S.M. reported Martinez's abuse to police. Officer Newsome brought S.M. and her mother to Billings Clinic for the examination and Officer Newsome obtained a statement from S.M. while at the hospital. In contrast, Dr. Brewer saw S.M. in a follow-up appointment where she assessed S.M.'s medical needs based on S.M.'s narrative and ordered a course of medical treatment particular to S.M., including trauma counseling with a therapist. She additionally saw S.M. when she was admitted into the pediatric ICU for a severe eating disorder and anemia. Dr. Brewer had concerns she was suffering from post-traumatic stress disorder and believed S.M. was suicidal. When considering whether statements made outside of court are testimonial, all circumstances must be considered with no specific circumstance controlling. Accordingly, to answer the question whether

11

S.M.'s statements to Nurse Woods and Dr. Brewer were testimonial, we must evaluate the statements independently.

¶23 Beginning first with S.M.'s statements to Dr. Brewer, our analysis in *Porter* is persuasive. Porter was charged with aggravated assault for strangling his domestic partner. When the victim showed up for work with a black eye and significant bruising, her supervisor called the police. *Porter*, ¶ 2. Police responded and brought the victim to the emergency room where she signed a release allowing the collection of evidence and release of her health care information to law enforcement. *Porter*, ¶ 2. Dr. Tiffany Kuehl, an emergency room physician and the medical director of the SANE team, examined the victim. *Porter*, ¶ 2. Dr. Kuehl noted tenderness, bruising, and other markings consistent with strangulation. *Porter*, ¶ 2. The victim did not appear for trial and, over objection from Porter, Dr. Kuehl was allowed to testify about the "verbal history" of the incident she elicited from the victim. *Porter*, ¶¶ 3, 8. In addition to obtaining the victim's narrative about the events giving rise to her injuries, Dr. Kuehl asked the victim about the identity of her attacker because it was important to "guarantee[] the safety of the patient" and that the patient not be discharged into a volatile situation. *Porter*, ¶ 9. We rejected Porter's argument that Dr. Kuehl was acting as a SANE, noting that Dr. Kuehl was a physician, not a nurse, who provided the victim with medical care. *Porter*, ¶ 25. Beyond ensuring future safety, the verbal history provided by the victim gave Dr. Kuehl necessary information to decide what treatment to order for the victim. *Porter*, ¶ 24. We held that the primary purpose of Dr. Kuehl's conversation with the victim was not to create an out-of-court

12

substitute for trial testimony; rather, the victim's primary purpose in speaking with Dr. Kuehl was to receive medical care for her injuries. *Porter*, ¶ 26. The victim's statements to Dr. Kuehl were therefore nontestimonial. Further, while nonetheless hearsay, we concluded that the victim's statements were admissible under M. R. Evid. 803(4), because the victim's statements were made "for purposes of medical diagnosis or treatment," including statements that describe "medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof" which are excepted from the general hearsay prohibition, "insofar as reasonably pertinent to diagnosis or treatment." *Porter*, ¶ 30; M. R. Evid. 803(4).

¶24 Here, Martinez does not challenge whether S.M.'s statements were "reasonably pertinent to diagnosis or treatment" under M. R. Evid. 803(4), as Porter did in his proceeding. Martinez's challenge relates only to his confrontation rights. However, Dr. Brewer's medical treatment and relationship to S.M. is indistinguishable from the relationship and treatment provided by Dr. Kuehl to Porter's victim. Regardless of whether Drs. Kuehl or Brewer had an ulterior prosecutorial motive as the medical director of the SANE team, each first and foremost had the primary purpose of providing medical diagnosis and care to their patients. Both physicians relied upon the narrative and verbal history of the victims in diagnosing and treating their patients, and both operated as medical providers who delivered medical treatment specific to their patient's needs and not pursuant to a police directive or a police investigation. While each case must be judged on its facts with no specific fact or circumstance controlling, *Porter* provides persuasive

13

authority under a similar fact scenario that S.M.'s statements to Dr. Brewer were nontestimonial. Although Dr. Kuehl in *Porter* was performing a SANE examination which had a dual purpose of collecting evidence for a criminal prosecution, the SANE examination here had already been completed by Nurse Woods. Dr. Brewer, a physician, was acting as a medical provider to S.M. when S.M. gave her verbal history detailing Martinez's abuse so that she might receive appropriate medical treatment. S.M.'s statements were thus nontestimonial.

¶25 Further, S.M.'s statements to Dr. Brewer are admissible as an exception to the prohibition against hearsay because the statements were made to a medical provider and were pertinent to diagnosis and treatment under M. R. Evid. 803(4). Martinez, on appeal, does not argue that S.M.'s statements were made for reasons other than a desire to receive medical treatment or that her statements were irrelevant to the diagnosis and medical treatment rendered. The District Court did not err in concluding the statements were nontestimonial and admissible pursuant to the medical treatment exception to the prohibition of hearsay. We now turn to S.M.'s statements to Nurse Woods, the SANE.

¶26 We recently addressed whether statements to a SANE were testimonial in *Tome*. In *Tome*, a developmentally disabled victim was determined by the court to be incompetent to testify as a witness. *Tome*, ¶ 1. The court allowed the state to introduce the victim's "narrative" to the SANE through testimony of the SANE without Tome having had an opportunity to cross examine the victim. *Tome*, ¶ 15. The court also, over objection, allowed the state to introduce the victim's statements to a police officer and admitted the

14

entire forensic interview conducted by a forensic interviewer with the Department of Health and Human Services (DPHHS). *Tome*, ¶ 15. We concluded that the statements made to the SANE, the police, and the DPHHS child protection specialist were testimonial "in that they were conducted as part of a police investigation where there was no 'on-going emergency, and . . . the primary purpose of the investigation was to establish or prove past events potentially relevant to later criminal prosecution.'" *Tome*, ¶ 35 (quoting *Davis*, 547 U.S. at 822, 126 S. Ct. at 2273-74).

¶27 The SANE examination here is indistinguishable from the SANE examination in *Tome*. In both instances, the SANE examination was conducted to collect evidence of sex-based crimes for purposes of future litigation. The cover sheet to the SANE examination consent form has the patient attest to the fact that they "understand that this is not a routine medical checkup. . . ." Furthermore, the consent form indicates that the examination is done, in part, to "[c]ollect evidence," take photographs "to be used as evidence," and "[r]elease evidence collected and information obtained to law enforcement." The front page of the consent form specifically states that the examiner "will not be held responsible for identifying, diagnosing, or treating any existing medical problems." Additionally, Nurse Woods saw S.M. on one occasion for the purpose of completing the SANE examination and collecting evidence to turn over to law enforcement. Officer Newsome brought S.M. to Billings Clinic for a SANE examination to be completed. Following the examination, law enforcement obtained a statement from S.M. Finally, for purposes of medical treatment S.M. was referred to Dr. Brewer. While

no single factor is controlling, under the facts here, as in *Tome*, we conclude that S.M.'s statements to Nurse Woods were testimonial in nature and inadmissible in Martinez's trial absent Martinez having an opportunity for cross-examination.

¶28 The special concurrence faults the Court for failing to acknowledge that Martinez forfeited his Confrontation Clause claims when "the jury convicted Martinez—beyond a reasonable doubt—of solicitation to tamper with witnesses." Special Concurrence, ¶ 15. The special concurrence, relying on subsection (d) of the tampering statute— "to induce or otherwise cause a witness or informant to : . . . (d) not appear at any proceeding or investigation to which the witness or informant has been summoned"—argues that "[t]he conviction, on its face, shows that Martinez forfeited his Confrontation Clause rights in that he purposefully caused S.M.'s absence, intending that she remain absent." Special Concurrence, ¶ 10. To begin, the forfeiture by wrongdoing doctrine was neither raised nor addressed at any point during the trial proceedings or on appeal. The forfeiture doctrine requires that "a *judge* determine[] that a wrongful act by the defendant made the witness *unavailable* to testify at trial." *Giles v. California*, 554 U.S. 353, 355, 128 S. Ct. 2678, 2681 (2008) (emphasis supplied). The doctrine or rule applies "only when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Giles*, 554 U.S. at 359, 128 S. Ct. at 2683 (emphasis in original). In *Giles*, the Court explained that the "forfeiture rule applied when a witness had been kept out of the way by the prisoner, or by some one on the prisoner's behalf, *in order to prevent him from giving evidence against him*." *Giles*, 554 U.S. at 361, 128 S. Ct. at 2684 (emphasis in original; internal quotation

16

marks and citations omitted). The right protected by the Confrontation Clause is thus the right to have the witness present and testify; it is not a right that guarantees the witness will give particular testimony. While a tampering conviction potentially could indicate the defendant intended to procure a witness's unavailability, it does not, standing alone as the special concurrence urges, serve as a substitute for a trial judge's findings and conclusions necessary to invoke the forfeiture doctrine. Before the doctrine may be invoked, a judge must determine that there was "(1) wrongful conduct, (2) *intended* to cause the witness's *unavailability*, and (3) *actually causing* the witness's unavailability." *United States v. Pratt*, 915 F.3d 266, 275 (4th Cir. 2019) (emphasis supplied). Here, none of these determinations were made by the trial court because the forfeiture doctrine was never mentioned during trial or, for that matter, by any party on appeal. Moreover, considering the content of what Martinez said to T.M. on the recorded line, a judge could easily have found that Martinez was soliciting T.M. to have S.M. change her story and give a different report to police, not for T.M. to make sure S.M. was unavailable for trial. The intent required is a specific one, as the *Giles* Court explained; the exception only applies when the actor "has in mind the particular purpose of making the witness unavailable" by his conduct. *Giles*, 554 U.S. at 367 (internal quotation marks and citation omitted). Thus, before the forfeiture by wrongdoing doctrine can be invoked, it must be raised and considered by the trial court, who then makes a determination and establishes a record based on all of the circumstances of the case. None of that was done here.

¶29 Further, the special concurrence is simply wrong that Martinez was convicted of tampering with S.M. Martinez was charged with *solicitation* to tamper with S.M.'s mother, T.M.; not tampering with S.M. More importantly, however, the jury here was given the following instruction, which specifically omitted the unavailability language contained in subsection (d) of the tampering statute upon which the special concurrence relies:

> A person commits the offense of tampering with a witness if, believing that an official proceeding or investigation is pending or about to be instituted, the person purposely of knowingly attempts to induce or otherwise cause a witness to testify or inform falsely or to withhold any testimony, information, document, or thing.

The jury was not instructed, and therefore could not find, that Martinez was guilty of tampering on the basis that he induced or caused S.M. not to appear, as set forth in subsection (d) of the tampering statute. The State was not proceeding with its tampering prosecution on the theory espoused by the special concurrence, i.e., that Martinez's wrongdoing had the particular purpose of making S.M. unavailable. Rather, the State's tampering prosecution was based on Martinez's solicitation of T.M. and a theory that Martinez attempted to have T.M. ensure S.M. *testify falsely*. The State was not contending, nor was the jury instructed, that Martinez was attempting to procure T.M.'s unavailability; rather, the jury convicted Martinez of soliciting T.M. to have S.M. change her story. A conviction for tampering, particularly under the circumstances here, does not automatically forfeit a defendant's confrontation rights under the forfeiture for wrongful conduct doctrine. The propriety of applying the forfeiture doctrine must first be raised by the State, who is familiar with the underlying facts of the case, and then considered by the trial judge.

18

The trial judge must make findings and conclusions for each element of the doctrine: (1) wrongful conduct, (2) intended to cause the witness's unavailability, and (3) actually causing the witness's unavailability. It was for the trial court to decide whether Martinez's conduct satisfied the causation requirement or whether his actions were too indirect or attenuated. It was similarly for the trial court to decide whether Martinez had the specific intent to procure S.M.'s *unavailability*. To foreclose an important and fundamental right, such as the right of confrontation, absent such a record and findings, is ill-advised.

¶30 Having concluded that the court erred in admitting Nurse Woods's testimony regarding S.M.'s statements, we must address whether the error was harmless. A harmless error analysis requires this Court to consider "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, and the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points." *Mercier*, ¶ 31. The cumulative evidence test requires that the Court look "not to the quantitative effect of other admissible evidence, but rather to whether the fact-finder was presented with admissible evidence that proved *the same facts as the tainted evidence proved*." *Mercier*, ¶ 31 (emphasis in original). The cumulative evidence must demonstrate that there was no reasonable possibility the evidence admitted in error might have contributed to the conviction. *State v. Santillan*, 2017 MT 314, ¶ 35, 390 Mont. 25, 408 P.3d 130 (citations omitted).

¶31 Based on the record before us, we conclude that the admission of S.M.'s statements to Nurse Woods, while in error, was harmless. Not only did Officer Newsom and Dr.

19

Brewer testify to the statements S.M. made—which were identical to those made to Nurse Woods—but Det. Dennler related to the jury Martinez's abuse of S.M. and testified that S.M.'s statements during her forensic interview with Det. Wichman were identical to those made to Nurse Woods. Thus, while the admission of S.M.'s statements to Nurse Woods was error, the error was harmless because the same testimony was admitted through Officer Newsome, Dr. Brewer, and Det. Dennler.

**CONCLUSION**

¶32 S.M.'s statements to Dr. Brewer were nontestimonial and properly admitted under M. R. Evid. 803(4). S.M.'s statements to Nurse Woods were testimonial and it was error to admit the statements absent an opportunity for Martinez to cross-examine S.M. However, we conclude, based on the record, that the error was harmless. There was amply cumulative evidence admitted that proved the same facts as the tainted evidence. The quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction.

¶33 Martinez's conviction is affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ JIM RICE
/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA

Chief Justice Mike McGrath, specially concurring.

¶34 While I agree with the result reached by the majority, I write separately. Martinez forfeited his Confrontation Clause rights when he "'engaged in conduct *designed* to prevent the witness from testifying.'" *Sanchez v. State*, 2012 MT 191, ¶ 9, 366 Mont. 132, 285 P.3d 540 (*Sanchez II*) (quoting *Giles*, 554 U.S. at 359, 128 S. Ct. at 2683) (emphasis in original). Thus, we need not reach the question of whether S.M.'s statements to the SANE were testimonial or whether their admission was harmless.

¶35 There are two founding era exceptions to the Confrontation Clause: dying declarations and forfeiture by wrongdoing. *Giles*, 554 U.S. at 358–59, 128 S. Ct. at 2682–83. The forfeiture exception derives from the maxim that a defendant should not be permitted to benefit from his own wrongdoing. *Giles*, 554 U.S. at 365, 128 S. Ct. at 2686. Discussing the history of the exception back to 1666, *Giles* explained that forfeiture by wrongdoing "permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant." *Giles*, 554 U.S. at 359, 128 S. Ct. at 2683 (citation omitted).

¶36 *Giles* considered "whether a defendant forfeits his Sixth Amendment right to confront a witness against him when a judge determines that a wrongful act by the defendant made the witness unavailable to testify at trial." *Giles*, 554 U.S. at 355, 128 S. Ct. at 2681. In *Giles*, the defendant shot and killed his ex-girlfriend—but not to prevent her from testifying. Prosecutors sought to introduce statements she had made to police responding to a domestic violence report several weeks earlier. The trial court admitted the statements and held that Giles had forfeited his confrontation rights "because he had

21

committed the murder for which he was on trial, and because his intentional criminal act made [the witness] unavailable to testify." *Giles*, 554 U.S. at 357, 128 S. Ct. at 2682. The Supreme Court vacated the California court's opinion and remanded for further proceedings because the trial court had not taken evidence on whether Giles had wrongfully caused the witness's unavailability *intending* that result. *Giles*, 554 U.S. at 377, 128 S. Ct. at 2693.

¶37 We discussed the forfeiture by wrongdoing exception to the Confrontation Clause in *State v. Sanchez*, 2008 MT 27, ¶¶ 39–47, 341 Mont. 240, 177 P.3d 444 (*Sanchez I*), which preceded the United States Supreme Court's decision in *Giles*. In *Sanchez I*, we acknowledged that Fed. R. Evid. 804(b)(6) codifies the forfeiture doctrine under the Confrontation Clause: "A statement [is admissible when] offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." *Sanchez I*, ¶ 42; *see Davis*, 547 U.S. at 833, 126 S. Ct. at 2280; *Giles*, 554 U.S. at 367, 128 S. Ct. at 2687. We held in *Sanchez I* that intent to silence the witness was not a required element of forfeiture by wrongdoing when a deliberate criminal act results in the victim's death. *Sanchez I*, ¶ 46. Although *Giles* made it clear that this part of our holding was incorrect because intent is a required element, *Giles* does not affect the fact that forfeiture is a recognized exception under both the Montana Constitution and the United States Constitution. *See Sanchez I*, ¶ 47 ("Sanchez cannot claim that his Montana constitutional right to 'meet the witnesses against him face to face' was violated when his admittedly deliberate wrongdoing prevented such a confrontation." (quoting Mont. Const. art. II, § 24)); *Davis*, 547 U.S. at 833, 126 S. Ct.

at 2280. We have not had occasion before now to reconsider the forfeiture exception since *Giles*. *Sanchez II*, ¶ 16. I believe this case presents a clear application of the forfeiture exception and would affirm on those grounds.

¶38 As an initial matter, the forfeiture by wrongdoing exception to the Confrontation Clause does not require the defendant to have killed the witness to forfeit their rights. The United States Supreme Court has long held that the exception applies whenever a defendant has wrongfully caused, or acquiesced in, a witness's absence, intending for them to be unavailable as a witness. For example, *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 158 (1879)—cited with favor in *Crawford* and *Giles* as an example of forfeiture by wrongdoing—held:

> The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; *but if a witness is absent by his own wrongful procurement*, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; *but if he voluntarily keeps the witnesses away*, he cannot insist on his privilege. If, therefore, *when absent by his procurement*, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.

(Emphasis added.) In *Reynolds*, the United States Supreme Court held that admitting a witness's testimony was not error under the forfeiture exception. An officer had gone to the witness's house (where she lived with the defendant) several times to serve a subpoena for her to appear. The defendant answered that she was not there and refused to answer where she was. At trial, the court admitted her prior testimony with those facts before it. The Supreme Court held these facts were enough to shift the burden to the defendant to

23

account for the absence of the witness or to deny under oath that he had kept her away. *Reynolds*, 98 U.S. at 159–60.

¶39 Even *Giles* cannot be read to stand for the proposition that a witness must have died before the forfeiture exception is considered: "We are aware of no case in which the exception was invoked although the defendant had not engaged in conduct designed to prevent a witness from testifying, *such as offering a bribe*." *Giles*, 554 U.S. at 361, 128 S. Ct. at 2684 (emphasis added); *see also Giles*, 554 U.S. at 365, 128 S. Ct. at 2686 ("The absence of a forfeiture rule covering this sort of conduct would create an intolerable incentive for defendants to *bribe, intimidate, or even kill* witnesses against them." (emphasis added)).

¶40 Modern cases also hold that any wrongful act which prevents a witness from testifying, and was designed to do so, is enough to apply the forfeiture exception. *See, e.g.*, *United States v. Johnson*, 767 F.3d 815, 823 (9th Cir. 2014) (threats); *United States v. Scott*, 284 F.3d 758, 763–64 (7th Cir. 2002) (monetary gifts and a hushed conversation); *United States v. Ponzo*, 853 F.3d 558, 578–79 (1st Cir. 2017) (defendant fleeing from prior trial where witness was available forfeited his confrontation rights); *State v. Maestas*, 2018-NMSC-010, ¶ 34, 412 P.3d 79 (N.M. 2018) ("[A]pplication of the forfeiture-by-wrongdoing exception requires no showing of overt threat of harm; it applies to any conduct intended to interfere with or undermine the judicial process.").

¶41 *Giles* emphasizes that, to meet the forfeiture by wrongdoing exception, the defendant must have caused the witness's absence, *intending* to do so. *See generally Giles* (emphasizing the defendant's *design*); *see also Giles*, 554 U.S. at 361, 128 S. Ct. at 2684

24

("The manner in which the rule was applied makes plain that unconfronted testimony would *not* be admitted without a showing that the defendant *intended to prevent a witness from testifying.*" (second emphasis added)). Thus, the party seeking to introduce a testimonial hearsay statement must show, by a preponderance of the evidence, that an expected witness became unavailable because of the defendant's misconduct, and that the defendant intended to cause the witness's unavailability. *See Maestas*, ¶ 25; *Johnson*, 767 F.3d at 822–23; *Davis*, 547 U.S. at 833, 126 S. Ct. at 2280. This case easily satisfies this requirement.

¶42 There can be no doubt that S.M. was an intended witness and was unavailable for trial. S.M. and her mother were both key witnesses against Martinez. There is also no doubt that S.M. and her mother failed to appear to testify at trial, despite being served with subpoenas. The fundamental issue is whether Martinez intended to prevent S.M. and her mother from testifying.

¶43 The jury unanimously found Martinez guilty of solicitation to tamper with witnesses. The jury was instructed that solicitation occurs "when, with the *purpose* that the offense of Tampering with Witnesses be committed, the person commands, encourages, or facilitates the commission of Tampering with Witnesses." (Emphasis added.) *See also* § 45-4-101, MCA. Tampering with witnesses occurs "if, believing that an official proceeding or investigation is pending . . . , the person purposely or knowingly attempts to induce or otherwise cause a witness or informant to: . . . (d) not appear at any proceeding or investigation to which the witness or informant has been summoned." Section 45-7-206,

25

MCA. The conviction, on its face, shows that Martinez forfeited his Confrontation Clause rights in that he purposefully caused S.M.'s absence, intending that she remain absent.

¶44    But even if Martinez had not been convicted of solicitation to tamper with witnesses, the facts in this case would still be enough to hold that Martinez had forfeited his confrontation rights. The prosecution introduced multiple phone calls that Martinez made to S.M.'s mother while he was in jail awaiting trial, which supported his conviction for solicitation.

¶45    Martinez was arrested on June 13, 2019. Exhibits introduced at trial show that he immediately started calling S.M.'s mother, trying to get her to convince S.M. not to testify. In one call on the day he was arrested, Martinez told S.M.'s mother:

> "Remember yesterday at [unclear]? . . . Remember what I was telling you to? . . . Don't say nothing but do that. . . . I can't say it on the phone, alright? Remember what I talked about? Ok, you guys go do that and you go tell them. . . . They got me for I, II, and III [(incest)], those are all felonies . . . so I need that to go away. . . . You hear me? . . . The sooner you do that the sooner I get out."

Fifteen minutes later, he called again and urged S.M.'s mother to talk to the prosecutor and detective because it was the only thing that would help get him out. In a third call that same day:

Martinez: "Whatever happens, you guys, you gotta--"

Mother: "I know. Don't! I know."

Martinez: "Do what I told you, do what I told you. Well, not you."

Mother: "I know."

Martinez: "Not you."

Mother: "I know, don't say anything here."

Martinez: "I know, I know . . . . Just remember what I said, ok? Everything. I need to get out of here. You hear me?"

Mother: "Yes."

A few days later, after his arraignment, Martinez told S.M.'s mother: "Man, that was fucked up in court. . . . You better tell [S.M.] to switch up like really fast if you want me out, no matter what. You hear me? You hear me? . . . Cause' if that don't happen, I'm fucked." After recounting the State's witnesses against him, Martinez emphasized: "What really matters is what I told you—the main thing, the main thing—[if] it doesn't happen, I'll be ok."

¶46 Martinez repeatedly told S.M.'s mother to "do what I told you." Martinez succeeded—S.M. and her mother did not appear at trial to testify.

¶47 These facts are substantially similar to *Pratt*, 915 F.3d at 275–76, where the Fourth Circuit concluded the defendant's Confrontation Clause rights were forfeited by the phone calls he made to the victim and her mother. Like here, Pratt, also violating a no-contact order, called the witness's mother from jail several times and urged the victim not to cooperate as a witness against him. The court held that—standing alone—the calls were sufficient as veiled threats to not testify, but that this became even clearer when placed in the backdrop of the physical abuse the victim had endured from him prior to his arrest. *See also, e.g.*, *Maestas*, ¶¶ 38, 45 (phone calls from jail "repeatedly demand[ing] that Barela lie for him and give the prosecution an account different from the one previously given may also support an inference that he intended to secure her unavailability."); *United*

*States v. Montague*, 421 F.3d 1099, 1104 (10th Cir. 2005) (discussions about changing witness's story).

¶48    We need not discuss the nuances of the forfeiture exception today as this case presents such a clear example of it: S.M. was a key witness for the prosecution; Martinez repeatedly called S.M.'s mother from jail and told her S.M. had to switch up her story; although in contact with prosecutors days before trial, S.M. and her mother failed to appear at trial despite a subpoena; and the jury convicted Martinez—beyond a reasonable doubt—of solicitation to tamper with witnesses.  Martinez clearly intended for S.M. to not testify against him, and his phone calls caused this to happen.  Martinez forfeited any Confrontation Clause claims he might have had with these actions.  The majority errs by not acknowledging this.  Instead, it relies on a harmless error analysis which—but for the State's other evidence—would have allowed Martinez to benefit from his own wrongdoing.

/S/ MIKE McGRATH